**In re MIRANT CORPORATION, et al., Debtors.**

(Matter of Debtors' Motion for Order Authorizing the Debtors to Reject the Back–to–Back Agreement Dated December 19, 2000, and Amendments Thereto, With Potomac Electric Power Company as Executory Contracts)

No. 4–03–CV–1242–A.

United States District Court, N.D. Texas, Fort Worth Division.

Dec. 23, 2003.

Michael L. Bernstein, Daniel M. Lewis, Arnold & Porter, Washington, DC, Michael A. McConnell, Winstead Sechrest & Minick, Fort Worth, TX, for Office of the People's Counsel for the District of Columbia, Movant.

Monica S. Blacker, Andrews & Kurth—Dallas, Dallas, TX, Mark F. Sundback, Andrews & Kurth—Washington, DC, for The Official Committee of Unsecured Creditors of Mirant Corporation, et al., Intervenor Plaintiff.

Wayne A. Cross, Robert A. Milne, Jack E. Pace, III, White & Case—New York, New York City, Judith Elkin, Haynes & Boone, Dallas, TX, for Mirant Corporation, Plaintiff.

Sander L. Esserman, Stutzman Bromberg Esserman & Plifka, Dallas, TX, Roger Frankel, Jonathan P. Guy, Swidler Berlin Shereff Friedman, Washington, DC, for Potomac Electric Power Company, Defendant.

Dennis Lane, Federal Energy Regulatory Commission, Washington, DC, for Federal Energy Regulatory Commission, Defendant.

James B. Ramsay, Grace Delos Reyes, National Ass'n of Regulatory Utility Commissioners, Washington, DC, for National Association of Regulatory Utility Commissioners, Movant.

### MEMORANDUM OPINION and ORDER

McBRYDE, District Judge.

Came on for consideration the motion of Mirant Corporation and its affiliated debt-

ors, as debtors in possession, (collectively and severally "Debtors") for an order authorizing Debtors to reject an agreement between Mirant Corporation (when named "Southern Energy, Inc.") and Potomac Electric Power Company ("PEPCO") and enjoining any person or entity from seeking specific performance of the rejected agreement after the date of the order. Having considered the motion and the documents filed in response and opposition thereto, the court has concluded that the motion should be denied.

## I.

### Procedural History

The motion was filed on August 28, 2003, in the bankruptcy court for this district in case number 03–46590, which is the number assigned to jointly administered cases before the bankruptcy court that were instituted July 14, 2003, by voluntary petitions for relief filed by Debtors under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1330. On the day the motion was filed, Debtors sought and obtained from the bankruptcy court an *ex parte* temporary restraining order, converted on September 25, 2003, to a preliminary injunction, which, *inter alia*, prohibits the Federal Energy Regulatory Commission ("FERC") from taking any action, or encouraging any person or entity to take an action, to require or coerce Debtors to abide by the terms of the agreement Debtors seek to reject.[1]

---

1. The temporary restraining order and preliminary injunction were entered by the bankruptcy court in an adversary proceeding Debtors instituted against PEPCO and FERC at the time of the filing of the motion to reject. As reflected in the text, a motion of PEPCO and FERC to withdraw the reference to the bankruptcy court of that adversary proceeding has been granted.

PEPCO and FERC moved to withdraw the reference to the bankruptcy court as to the motion to reject and a related adversary proceeding. Consistent with local practice, the bankruptcy court evaluated the merits of the motion to withdraw, and on September 25, 2003, made its Report and Recommendation Regarding Withdrawal of Reference, recommending that withdrawal of reference be denied as to the motion to reject, but granted as to the adversary proceeding. By order signed October 9, 2003, the court granted the motion to withdraw in its entirety.

Documents in opposition to the motion to reject have been filed by PEPCO and FERC. The Official Committee of Unsecured Creditors of Debtors ("Committee") filed a document in support of the motion. Two *amici*, National Association of Regulatory Utility Commissioners ("NARUC") and Office of the People's Counsel for the District of Columbia ("OPC"), filed briefs in opposition to the motion.

## II.

### Overview of Pertinent Facts

A. The Rights and Obligations Debtors Seek to Reject

Debtors move for authority to reject a set of rights and obligations they call the "Back–to–Back Agreement."[2] Those rights and obligations are a part of an Asset Purchase and Sale Agreement for Generating Plants and Related Assets, dated June 7, 2000 (as amended and supplemented, the "APSA"), between PEPCO

---

2. In its opposition, PEPCO uses the term "Back–to–Back Arrangement" to refer to the same set of rights and obligations Debtors call the "Back–to–Back Agreement." For convenience, the court is adopting Debtors' use of the term "Back–to–Back Agreement."

and Mirant Corporation, then known as "Southern Energy, Inc." [3] By the APSA, PEPCO sold, as part of a series of divestiture transactions, the majority of its generating assets and power purchase agreements ("PPAs") to Debtors. However, certain of the power suppliers under the PPAs with PEPCO refused to consent to the assignment of their agreements with PEPCO. The possibility of that happening was anticipated by the APSA. In its section 2.4, the APSA provides that, if consent to an assignment could not be obtained, or if any attempted assignment would in PEPCO's opinion be ineffective or impair material rights or obligations of Debtors under a PPA, PEPCO would remain liable to pay for and take delivery of power under the unassigned PPAs, and Debtors would reimburse PEPCO for its payments and receive from PEPCO all power thus delivered.

According to section 2.4(b), the specifics of the arrangement were to be governed by section II of schedule 2.4 attached to the APSA. Section II (sub-sections B and C) provides that Debtors will purchase from PEPCO all of the capacity, energy, and other benefits under each unassigned PPA, and will pay PEPCO the amount that PEPCO pays to the seller under such PPA. Panda–Brandywine LP ("Panda") and Ohio–Edison Co. ("Ohio–Edison") were two of the non-consenting power sellers.[4] The Ohio–Edison PPA is in effect until the year 2005 and the Panda PPA is in effect until the year 2021. PEPCO's purchase price obligations under those PPAs are significantly in excess of the market value of the power it is purchasing, as are Debtors' purchase price obligations to PEPCO.

After the process to divest PEPCO's assets had begun, but before execution of the APSA, Panda commenced litigation in Maryland challenging the validity of schedule 2.4 of the APSA. The uncertainties posed by the Maryland litigation were addressed by section 3.4 of the APSA, titled "PPA–Related Purchase Price Adjustments," which, in effect, provided that if Debtors were released from obligations related to the Panda PPA, and if that PPA was not assigned to Debtors under the provisions of schedule 2.4, Debtors would make an additional cash payment to PEPCO of approximately $260 million.

The asset sale contemplated by the APSA closed on December 19, 2000. By letter bearing that date, PEPCO listed the PPAs for which it had been unable to obtain consents to assignment, as provided by section 2.4, which included the Panda and Ohio–Edison PPAs. As section 2.4 contemplated, the letter said that the rights and obligations of the parties with respect to those PPAs would be governed by schedule 2.4, and that PEPCO would not exercise its right to require the purchase price adjustment provided under section 3.4. By another letter of that date, the parties agreed that a purchase price adjustment in an amount to be determined

3. Certain rights and obligations under the Back–to–Back Agreement were transferred to or assumed by affiliates and subsidiaries of Mirant Corporation, each of which apparently is one of the Debtors. For convenience, the court is referring to Mirant Corporation and each of those affiliates and subsidiaries collectively and severally as "Debtors."

4. The record indicates that there were other non-consenting power sellers, but Debtors fo-

cus in their motion on the losses they are suffering through the Back–to–Back Agreement by reason of above-market prices PEPCO is obligated to pay to Panda–Brandywine LP and Ohio–Edison Co., pursuant to its PPAs with them (which, in turn, Debtors must pay to PEPCO). The papers filed by Debtors do not make specific reference to any other non-consenting power seller.

later would be made if a court were to declare the Back–to–Back Agreement void with respect to the Panda PPA within two years of the closing date. That deadline was first extended to December 19, 2004, by letter dated April 4, 2002, and then to March 19, 2005, by letter dated October 4, 2002.

In June 2003, the Maryland Court of Appeals ruled on Panda's claim that the APSA violated the anti-assignment provisions of Panda's PPA with PEPCO, holding that the provisions of the APSA appointing Debtors as PEPCO's agent for all purposes was invalid, but did not otherwise rule on the validity of the provisions of schedule 2.4 of the APSA. The effect of the ruling of the Maryland court was to leave intact the obligations that schedule 2.4 imposed on Debtors to purchase from PEPCO all of the capacity, energy, and other benefits PEPCO receives under the Panda PPA and to pay PEPCO the same amount that PEPCO pays to Panda.

### B. *Approval by FERC of the APSA and Related Back–to–Back Agreement*

In September 2000, Debtors, joined by PEPCO and other companies, made application with FERC pursuant to section 203 of the Federal Power Act ("FPA") (16 U.S.C. § 824b) for approval of PEPCO's divestiture transactions, including the transactions contemplated by the APSA. The application noted that power purchase entitlements with respect to certain PPAs were among the interests being purchased pursuant to the APSA. Debtors represented to FERC that the APSA would have no adverse effect on consumers and that it was in the public interest in that it "will not adversely affect competition, will not adversely affect wholesale or retail rates, and will not adversely affect regulation." App. in Support of Opposition 45.

The September 2000 application was accompanied by filings made under section 205 of the FPA (16 U.S.C. § 824d), which included schedule 2.4 of the Back–to–Back Agreement. With respect to schedule 2.4, the applicants gave the following explanation to FERC:

As noted above, Pepco's assignment of the PPAs, as the power purchaser thereunder, is not subject to Section 203 of the FPA. However, Pepco's resale to [Debtors] of the PPA Entitlements Pepco purchases under any Unassigned PPA is a wholesale sale subject to Section 205 of the FPA. Accordingly, Pepco submits Schedule 2.4 of the [APSA] and the PPAs ... for filing, subject to the conditions below, as a service agreement ("Schedule 2.4 Service Agreement") under its market-based rate tariff (Pepco Electric Tariff First Revised Volume No. 5), which was approved by the Commission in Docket No. ER98–4138–000. The Schedule 2.4 Service Agreement shall be designated as Pepco Service Agreement No. 20 under Pepco Electric Tariff First Revised Volume No. 5. Pepco requests that the Schedule 2.4 Service Agreement become effective at the effective time of closing under the [APSA]. Pepco further notes that the filing of the Schedule 2.4 Service Agreement hereunder is limited solely to those provisions pertaining to Pepco's FPA jurisdictional wholesale power sales described above and will apply only to the PPAs that are Unassigned PPAs during the period after closing under the [APSA].

After closing, Pepco will submit an informational filing with the Commission notifying it as to which of the PPAs are Unassigned PPAs subject to the Schedule 2.4 Service Agreement. Pepco requests that the Commission confirm that the informational filing will be sufficient and no further action by the Commission

will be required for the Schedule 2.4 Service Agreement to become effective as proposed above.

September 20, 2000, letter to FERC by counsel for applicants at 18–19 (footnotes omitted), NARUC App. at 291–92.

FERC issued an order in December 2000 approving the transactions proposed by the application, concluding that the proposed transactions were consistent with the public interest. Panda had opposed the Back–to–Back Agreement as it applied to Panda, maintaining that schedule 2.4 should be rejected as unjust and unreasonable until PEPCO acquired Panda's consent for the assignment, or that, alternatively, FERC should suspend schedule 2.4 and set the issue of its justness and reasonableness for a hearing. The FERC concluded that Panda's concerns were misplaced, explaining:

> Since PEPCO will remain the purchaser under the proposed transactions for the unassigned PPAs, Panda's concerns are misplaced. PEPCO will resell the PPA entitlements to [Debtors], at a rate equal to its payment obligations in the PPAs, therefore the Commission will accept Schedule 2.4 as just and reasonable. Consistent with PEPCO's proposal, we will accept Schedule 2.4 as an unexecuted service agreement under its Market–Based Rate Tariff and direct PEPCO to file an executed service agreement covering Schedule 2.4 once it has reached agreement with the PPAs.

App. in Support of Opposition at 72. As directed by the language quoted immediately above, in January 2001 PEPCO refiled at FERC schedule 2.4 of the APSA with an executed acknowledgment by Debtors that it sets forth the respective

rights and obligations of the parties as to the matters contained therein.

### III.

### *Contentions of Debtor, PEPCO, FERC, Committee, and Amici*

#### A. *Debtors' Motion*

The motion to reject was made pursuant to 11 U.S.C. § 365(a) and Federal Rules of Bankruptcy Procedure 6006 and 9014.[5] As ground for the motion, Debtors alleged that they have determined, after due inquiry, that the Back–to–Back Agreement is substantially burdensome to their estates and constitutes an impediment to their ongoing business operations. More specifically, Debtors alleged that:

> Among other things, according to the Debtors' analyses, the Back–to–Back Agreements are draining tens of millions of dollars per month from the estate, the anticipated losses to the estate through 2005 (on a nominal basis) are in excess of $300 million and those anticipated losses are even greater over the entire life of the agreement. . . .

Debtors' Amended Motion at 10. Debtors then alleged that they "believe that it is well within their business judgment to reject the Back–to–Back Agreement." *Id.*

While Debtors make the broad request for authority to reject the Back–to–Back Agreement, the only PPAs ·specifically mentioned in the motion are the Panda and Ohio–Edison PPAs.

#### B. *PEPCO's Opposition*

PEPCO argues in opposition to Debtors' motion that:

---

**5.** The motion to reject covers the Back–to–Back Agreement as originally formulated by the APSA and the executed schedule 2.4 as well as three letter agreements, dated December 19, 2000, April 4, 2002, and October 4, 2002, respectively, that Debtors contend are amendments to the basic Back–to–Back Agreement.

1. The court lacks subject matter jurisdiction to authorize Debtors to reject their obligations under the APSA without FERC's authorization because (a) the FPA vests exclusive jurisdiction over wholesale electric service in FERC, and (b) FERC has exclusive jurisdiction over the APSA obligations at issue in Debtors' motion.

2. The Bankruptcy Code's rejection authority is subject to the exercise by FERC of its regulatory powers.

3. Debtors have not satisfied the standards for rejection of the obligations imposed on them by the Back–to–Back Agreement.

4. The Back–to–Back Agreement is but a part of the APSA; and Debtors may not reject only a part of an agreement.

5. Debtors' purported business judgment analysis is deficient.

### C. *FERC's Comments in Opposition*

FERC opposes any order of the court that would prevent FERC from exercising its statutory grant of regulatory authority over the wholesale sale of electric energy in interstate commerce. The basic reason for FERC's opposition is that, FERC maintains, the Back–to–Back Agreement involves the wholesale sale of electric energy in interstate commerce, and, therefore, its rates, terms, and conditions of service fall within FERC's exclusive jurisdiction under the "FPA" (16 U.S.C. § 792, *et seq.*). Consequently, any decision regarding whether Debtors' service obligations under the Back–to–Back Agreement could or must be terminated should be made by FERC after it has evaluated various public interest factors, including whether termination of service is consistent with the principal purpose of the FPA—to assure that customers receive adequate supplies of energy at reasonable prices.

Also, FERC argues that any assessment of whether Debtors should be relieved of their obligations under the Back–to–Back Agreement should take into account all rights and obligations under the broader APSA, which involved several interrelated transactions, including the sale of PEPCO's generating assets to Debtors and the assumption by Debtors of certain of PEPCO's power purchase obligations. FERC notes that it approved the overall plan contained in the APSA, and that consideration of rejection of only a part of that plan would be inappropriate (saying "while individual components of the APSA might have appeared unreasonable, the overall effect of the plan was in the public interest," Comments of FERC at 3).

FERC represents to the court that the affected state regulatory agencies have sought guidance from FERC on legal issues related to the possible termination of service under the Back–to–Back Agreement, and that FERC has been prevented by the bankruptcy court's temporary restraining order and, then, preliminary injunction, from addressing matters related to the Back–to–Back Agreement. According to FERC, those restraints have made it impossible for FERC to state how it would rule on matters about which it has received inquiry because FERC has not been permitted to obtain needed information to address those matters or any other related to the Back–to–Back Agreement.

### D. *Reply of Debtors in Further Support of Their Motion to Reject*

Debtors respond that the Back–to–Back Agreement is a part of the Debtors' estates, and that the motion to reject is a core bankruptcy proceeding, with the consequence that, pursuant to the authority of 28 U.S.C. § 1334(e), the bankruptcy court has exclusive jurisdiction to determine whether Debtors should be authorized to

reject the Back–to–Back Agreement. In response to the opposing arguments that the Back–to–Back Agreement must be dealt with in the context of the entire APSA, Debtors maintain that the Back–to–Back Agreement is severable from the APSA and can be dealt with as a separate agreement. Debtors dismiss as meritless the challenges made to Debtors' business judgment analysis. Finally, Debtors maintain that the injunctive relief granted by the bankruptcy court is essential to protect the bankruptcy court's, and now this court's, jurisdiction, and to ensure that the benefits of rejection of the Back–to–Back Agreement are, in fact, realized by Debtors.

### E. Contentions of Committee in Support of Motion to Reject

Committee argues that rejection of the Back–to–Back Agreement does not, and should not, require or depend upon anything other than Debtors' business judgment. Apparently, Committee has misgivings about the injunctive relief granted by the bankruptcy court, arguing that "whether FERC, PEPCO or any other person or entity may ultimately force the Debtors to comply with the terms of the Back–to–Back Agreement … does not and should not affect the Debtors' ability to reject the same." Committee's Reply at 4. However, Committee joins Debtors in their argument that the bankruptcy court, and now this court, has exclusive jurisdiction over the Back–to–Back Agreement as property of the estate, and that whether rejection of the agreement should be allowed is a core bankruptcy function created by statute, which no non-bankruptcy court or other tribunal has the power to authorize or interfere with.

### F. Contentions of the Amici in Opposition to the Motion

The two amici take basically the same positions taken by FERC. They emphasize that the December 2000 FERC order approving PEPCO's divestiture transactions constituted, as applied to the Back–to–Back Agreement, FERC approval of the prices to be paid by Debtors to PEPCO as filed rates under 16 U.S.C. § 824d. And, the amici note that FERC retained jurisdiction over the transaction by expressly reserving jurisdiction under sections 203(b)· and 309 of the FPA (16 U.S.C. §§ 824b(b) and 825h).

OPC, which is an independent agency of the District of Columbia that was created by Congress to serve as the District's public advocate for utility consumers, argues that, if Debtors were to cease performance under the Back–to–Back Agreement, PEPCO would no longer be reimbursed for its payments under the unassigned PPAs, with the result that it undoubtedly would attempt to pass the burden of covering those unreimbursed payments to the ratepayers (residents of the District of Columbia and State of Maryland). Also, OPC makes the point that neither the bankruptcy court nor this court has the mandate or the ability to adequately identify and protect the public interest in a utility regulation context, with the consequence that the courts are not equipped to evaluate whether PEPCO should be relieved of its obligations under the Back–to–Back Agreement. OPC makes the further point that the obligations of Debtors under the Back–to–Back Agreement, to the extent that it constitutes a FERC-jurisdictional rate schedule, are independent of the agreement itself, thus maintaining that, even if the Back–to–Back Agreement were to be rejected, Debtors would continue to have the rights and obligations imposed by the agreement by reason of the actions that were taken by FERC when it approved the agreement and ruled that the payment obligations under the agreement were just and reasonable.

NARUC contends that FERC must be allowed to carry out its duties to protect the public interest, and maintains that the court is not authorized to interfere with the regulatory process contemplated by the FPA.

## IV.

### Analysis

For the reasons given below, the court has concluded that Debtors' motion to reject the Back–to–Back Agreement should be denied.

A. *Exclusive Authority Given FERC by the FPA Over the Pricing Features of the Back–to–Back Agreement*

By the FPA, Congress "declared that the business of ... selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to ... the sale of such energy at wholesale in interstate commerce is necessary in the public interest...." 16 U.S.C. § 824(a). In order to advance that public interest, Congress gave FERC jurisdiction over "the sale of electric energy at wholesale in interstate commerce" (with exceptions not applicable here). 16 U.S.C. § 824(b)(1). On the subject of just and reasonable rates, the FPA provided:

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of [FERC], and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

16 U.S.C. § 824d(a). Section 206 of the FPA (16 U.S.C. § 824e) authorizes FERC, after hearing, to change filed rates if it determines that they are unjust or unreasonable.

The Supreme Court has held that the FPA delegated to FERC (formerly the Federal Power Commission) "exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce." *New England Power Co. v. New Hampshire*, 455 U.S. 331, 340, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982). *See, also, Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 956, 966, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986). Included in the delegation is the "exclusive authority to determine the reasonableness of wholesale rates." *Mississippi Power & Light Co. v. Mississippi*, 487 U.S. 354, 371, 108 S.Ct. 2428, 101 L.Ed.2d 322, (1988). In *Montana–Dakota Utilities Co. v. Northwestern Pub. Serv. Co.*, the Supreme Court explained "that the right to a reasonable rate is the right to the rate which [FERC] files or fixes, and that, except for review of [FERC's] orders, the courts can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one." 341 U.S. 246, 251–252, 71 S.Ct. 692, 95 L.Ed. 912 (1951). "To reduce the abstract concept of reasonableness to concrete expression in dollars and cents is the function of [FERC]." *Id.* at 251, 71 S.Ct. 692. "FERC's exclusive jurisdiction applies not only to rates but also to power allocations that affect wholesale rates." *Mississippi Power & Light Co.*, 487 U.S. at 371, 108 S.Ct. 2428.

And, the Supreme Court has made clear that "[t]here can be no divided authority over interstate commerce ... the acts of Congress on that subject are supreme and exclusive" (internal quotation marks omitted). *Id.* at 377, 108 S.Ct. 2428. "No court may substitute its own judgment on reasonableness for the judgment of [FERC]." *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925,

69 L.Ed.2d 856 (1981).[6] "Congress ... has granted exclusive authority over rate regulation to [FERC]." *Id.* at 580, 101 S.Ct. 2925. "The reasonableness of rates and agreements regulated by FERC may not be collaterally attacked in state or federal courts." *Mississippi Power & Light Co.,* 487 U.S. at 375, 108 S.Ct. 2428. "The only appropriate forum for such a challenge is before [FERC] or a court reviewing [FERC's] order." *Id.*

■ If the parties contract for a particular rate that varies from the filed rate, the filed rate controls. *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. at 582, 101 S.Ct. 2925. "[T]o permit parties to vary by private agreement the rates filed with [FERC] would undercut the clear purpose of the congressional scheme: granting [FERC] an opportunity in every case to judge the reasonableness of the rate." *Id.*

■ In *Gulf States Utilities Co. v. Alabama Power Co.,* the Fifth Circuit reiterated that the FPA gives FERC exclusive jurisdiction over interstate wholesale utility rates, explaining that:

> The [FERC] has exclusive jurisdiction over interstate wholesale power rates: utilities must file their rates with the FERC, and the FERC can approve or alter such rates.

824 F.2d 1465, 1468 (5th Cir.1987). "Through the FPA, Congress preempted ... federal courts from acting in areas reserved exclusively for the FERC." *Id.* at 1470. The Fifth Circuit added that:

> The FPA permits utilities to charge only just and reasonable rates and to file their rates and sales contracts with the FERC. 16 U.S.C. § 824d(a–c). The

FERC may review the filed rates and, if it finds a rate to be unjust or unreasonable, it may fix a just and reasonable rate. 16 U.S.C. § 824e(a).

*Id.* at 1469–70.

■ In effect, the Fifth Circuit said in *Gulf States Utilities Co.* that the FPA denies courts, other than a court authorized to review FERC orders, the authority to grant a claim if the claim is based on a contention that the filed rate is more or less than desirable or appropriate. The court held that the federal courts cannot grant relief "on the theory that [such] rates are too high, unconscionable, or the cause of commercial impracticability or any other problems." *Id.* at 1474 (emphasis deleted).

■ Thus, in the absence of something that overrides the statutes and case authorities mentioned above, this court should not join with Debtors in their attempt to avoid their electric energy purchase payment obligations under the Back–to–Back Agreement at the filed rates FERC has found to be just and reasonable by authorizing rejection of the agreement. Clearly, the Back–to–Back Agreement involves the sale of electric energy at wholesale in interstate commerce. The record establishes without dispute that the prices to be paid by Debtors to PEPCO for such electric energy are filed rates that FERC has determined to be just and reasonable. The thrust of Debtors' motion to reject is that they should be permitted to reject the Back–to–Back Agreement because the rates, or prices, they are required by that agree-

---

**6.** *Arkansas Louisiana Gas Co. v. Hall* concerns the Natural Gas Act rather than the Federal Power Act, but the Supreme Court noted that the relevant provisions of the two statutes are substantially identical in all material respects, with the consequence that the Court has an "established practice of citing interchangeably decisions interpreting the pertinent sections of the two statutes." 453 U.S. 571, 577 n. 7, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981).

ment to pay for wholesale electric energy purchases are too high, alleging that "[t]he prices that the Debtors must pay pursuant to the Back–to–Back Agreement are significantly above current market prices, resulting in substantial monthly losses to the Debtors." Debtors' Am. Mot. at 8. This is precisely the kind of contention the cited statutory and case authorities indicate the court is prohibited from entertaining—it is a collateral attack on the filed rates and FERC's December 2000 order approving the Back–to–Back Agreement as just and reasonable.

B. *The Rejection Authority Provided by 11 U.S.C. § 365 Does Not Create an Exception to FERC's Exclusive Authority*

Section 365 of title 11 of the United States Code authorizes Debtors, subject to the court's approval, to reject any executory contract. By virtue of 28 U.S.C. § 1334(e), this court has had, since commencement of these chapter 11 cases, exclusive jurisdiction of all of the property of Debtors and their estates. Debtors contend that those statutory provisions give the court the power to authorize Debtors to reject the Back–to–Back Agreement notwithstanding the exclusive authority given FERC by the FPA.

Close in point is *In re NRG Energy, Inc.*, 2003 WL 21507685 (S.D.N.Y. June 30, 2003). In that case, the plaintiff, one of the debtors in a case under chapter 11 of the Bankruptcy Code, motioned the bankruptcy court for rejection of an electric energy sales agreement. The bankruptcy court found that the money-losing character of the agreement satisfied the business judgment standard for rejection of an executory contract under 11 U.S.C. § 365, and approved the rejection of the agreement. However, the bankruptcy court declined to enjoin FERC or to vacate an

FERC order requiring plaintiff to continue to provide service under the agreement. Instead, the bankruptcy court instructed plaintiff that it should seek an order from FERC to vacate agency's order or to take such other steps at FERC as debtor thinks are appropriate.

The plaintiff, NRG Power Marketing, Inc., then moved the district court for declaratory and injunctive relief seeking an adjudication from the district court that it was not obligated to perform under the agreement in light of the bankruptcy court's order authorizing its rejection (despite, and in contravention to, FERC's order requiring debtor's continued compliance with the agreement). In the course of denying the relief sought by debtor, the court recognized the exclusive jurisdiction given by Congress to FERC over the sale of electric energy at wholesale in interstate commerce, and FERC's exclusive authority to pass upon the reasonableness of the structure, terms, and conditions pertaining to the sale and distribution of wholesale electric rates. The court found that the agreement at issue was a wholesale power contract that fell within the purview of the FPA, and, hence, FERC's exclusive jurisdiction.

Similar to Debtor's arguments here, the plaintiff in *NRG* argued that the court was "confronted with a simple bankruptcy case that [was] nothing more than a dispute between two parties to a financial arrangement," and that the "relevant interests raised [were] merely those of [debtor's] creditors." *Id.* at *3. The court responded by saying, "given the unique regulatory framework for the business of selling electric energy and the pending FERC proceeding, the Court lacks jurisdiction to grant [debtor's] requested relief." *Id.* In support of its conclusion, the court cited with approval language used by the Second Circuit in *In re FCC*, 217 F.3d 125,

135 (2nd Cir.2000), to the effect that a regulatory agency is not required to defend its regulatory calculus in the bankruptcy court and that, if the decision is regulatory, it may not be altered or impeded by any court lacking jurisdiction to review it. The *NRG* court summed up its reasons for denying the relief by saying that "under the elaborate statutory scheme created by the FPA, only a federal court of appeals may exercise jurisdiction to review a FERC decision." *In re NRG Energy, Inc.*, at *4.

A distinction between the instant case and *NRG* exists in the fact that in *NRG* the FERC, upon the petition of authorities of the State of Connecticut and a public utility company, and apparently in response to the steps taken by the debtors to be relieved in the bankruptcy court of the burden of the power purchase agreement, ordered that the plaintiff continue to provide service pursuant to the rates, terms, and conditions of the agreement pending FERC's study of the effects of the proposed cessation of service. No such recent order has been made by FERC in the instant action, but that is not a determinative distinction. If Debtors were to be relieved by the court of their obligations under the Back–to–Back Agreement, there would be just as much an affront to the authority of the FERC (its December 2000 order approving the Back–to–Back Agreement as just and reasonable and its acceptance of the agreement as filed rates) as a ruling by the *NRG* court at variance with the FERC order there at issue would have been. In either event, the ruling would infringe on FERC's exclusive authority over the price for the purchase at wholesale of electric energy in interstate commerce. Somewhat apropos is the following language used by the *NRG* court:

Indeed, were the issues before the Court not to affect FERC's regulatory authority, the Court would properly possess

jurisdiction. The issue before FERC, however, is whether Plaintiff may cease performance of the Agreement given the FPA requirements adopted by Congress to protect wholesale power customers— a question that is squarely FERC's regulatory responsibility. In order to fulfill this FPA-delegated responsibility, FERC is now addressing a range of public interest concerns in light of Plaintiff's financial integrity. Thus, to the extent that Plaintiff believes that FERC erred in ordering it to perform under the Agreement, Plaintiff's appropriate remedy would be to seek review of FERC's order by a federal court of appeals. *See* 16 U.S.C. § 8251(a). This Court, however, is not the proper forum for Plaintiff to challenge FERC's regulatory action.

*Id.* at *4. Similarly, this court would not appear to be the proper forum for Debtors to challenge the rates that already have been filed with and approved by FERC.

In *Gulf States Utilities Co.* the Fifth Circuit used language that would suggest that if Debtors were seeking rejection of the Back–to–Back Agreement for a reason entirely separate from and independent of the prices to be paid pursuant to the agreement, this court would have authority to authorize the rejection. 824 F.2d at 1472. The Court provided the following explanation:

GSU also claims that the UPS and Interchange contracts should be set aside because Southern committed fraud and deceptive trade practices by falsely promising to negotiate in good faith. Assuming *arguendo* that such relief is available under state law, the FPA would not necessarily forbid the district court to set aside contracts obtained unconscionably or by fraud. The FERC does not warrant that filed contracts—

such as the UPS and Interchange Agreements—are free from fraud. By setting aside the contracts, the district court would not interfere with the FERC's rate-making powers. We stress, however, that the district court may not set aside the contracts on the theory that Southern's rates are too high.

*Id.* (footnotes omitted).[7] In effect, Debtors are asking this court to set aside their contract to purchase electric energy on the theory that PEPCO's rates are too high. The court has concluded that it should not entertain such a request and that, if Debtors wish to pursue relief of that kind, they should go to FERC.

 The court knows of no reason why Debtors cannot seek from FERC basically the same relief they are seeking here. In evaluating whether rates are just and reasonable, FERC is entitled to consider "whether the rate is so low as to adversely affect the public interest—as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." *Federal Power Comm'n v. Sierra Pac. Power Co.,* 350 U.S. 348, 355, 76 S.Ct. 368, 100 L.Ed. 388 (1956). While neither party to a wholesale energy purchase agreement has the right unilaterally to change or reject the agreement, *United Gas Pipe Line Co. v. Mobile Gas Corp.,* 350 U.S.

332, 344–45, 76 S.Ct. 373, 100 L.Ed. 373 (1956), either party would have the right to seek relief from FERC. If that were to occur, FERC would perform its function of determining whether the rate contemplated by the contract is at a level that adversely affects the public interest. In making its decision, FERC would be guided by its precedent that "the fact that a contract has become uneconomic to one of the parties does not necessarily render the contract contrary to the public interest." *Potomac Elec. Power Co. v. Fed. Energy Regulatory Comm'n,* 210 F.3d 403, 409 (D.C.Cir.2000). More importantly, as Congress had in mind, FERC would be able to bring to bear on the problem the knowledge and expertise it has in the regulation of the transmission and sale at wholesale of electric energy in interstate commerce in deciding the effect, if any, the solution proposed by Debtors would have on the public interest. As the Supreme Court explained in *Smith v. Hoboken R.R. Warehouse & S.S. Connecting Co.:*

> When the public interest, as distinguished from private, bulks large in the problem, the solution is largely a function of the legislative and administrative agencies of government with their facilities and experience in investigating all aspects of the problem and appraising the general interest.

328 U.S. 123, 131, 66 S.Ct. 947, 90 L.Ed. 1123 (1946).[8]

---

**7.** The Fifth Circuit subscribed to such a theory even though the setting aside of the contracts "would affect the filed rates by eliminating them," explaining that the Court "[did] not believe, however, that Congress meant through the FPA to preempt such indirect effects." *Gulf States Utilities Co. v. Alabama Power Co.,* 824 F.2d 1465, 1472 n. 9 (5th Cir.1987).

**8.** In *Smith v. Hoboken R.R. Warehouse & S.S. Connecting Co.,* Hoboken Manufacturers Railroad Co. had filed a petition for reorganiza-

tion under the then-effective Bankruptcy Act, and a trustee was appointed. The lessor of a lease in which Hoboken was the lessee obtained an order from the reorganization court authorizing the lessor to terminate the lease. 328 U.S. 123, 124–25, 66 S.Ct. 947, 90 L.Ed. 1123 (1946). The court of appeals affirmed, and the Supreme Court granted certiorari "because of the importance of the problem in the administration of the Interstate Commerce Act and the Bankruptcy Act." *Id.* at 125, 66 S.Ct. 947. The Supreme Court resolved the tension between the reorganization

■ Although this court has exclusive jurisdiction over all the property of Debtors and their estates, that jurisdiction does not give this court the power in exercising it to disregard the congressional mandate that FERC have exclusive responsibility for sales of electric energy at wholesale in interstate commerce, nor does the court's power to approve rejection of an executory contract prevail over FERC's regulatory authority.

### C. *The Rulings the Court Has Concluded Should be Made*

The court is satisfied that neither it nor the bankruptcy court has any authority to enjoin FERC from performing its regulatory functions; and, the court has no doubt that changing the regulatory rate scheme as to the power purchases contemplated by the Back–to–Back Agreement is beyond the authority of this court and the bankruptcy court.

■ Under the circumstances nothing would be gained by rejection of the Back–to–Back Agreement, nor can the court find that rejection of the agreement would be consistent with good business judgment of the Debtors. Rejection of the agreement would have the potential to expose Debtors to adverse action by the FERC as well as whatever damage claims would be created from their breach of the agreement, but not relieve Debtors of their regulatory obligations to pay the rates contemplated by the ·agreement. If Debtors were to be relieved by FERC of their regulatory obligations related to the transactions contemplated by the Back–to–Back Agreement, then there might well be reason for the

bankruptcy court or this court to consider a motion for authorization to reject the contractual commitments of the agreement. But, so long as the regulatory obligations of Debtors exist, the court does not deem appropriate a ruling in favor of Debtors on their motion to reject.

In addition to denying the motion to reject, the court is denying Debtors' request for injunctive relief. And, the court tentatively has concluded that all injunctive relief previously granted by the bankruptcy court in relation to the Back–to–Back Agreement should be dissolved.

While the court has considered to some degree all reasons assigned by PEPCO and FERC why Debtors' motion should be denied, the court does not find it necessary in order to resolve the issues before the court to rule on any of those contentions other than those dealt with above.

### V.

### *ORDER*

For the reasons given above,

The court ORDERS that the motion of Debtors for an order authorizing Debtors to reject the Back–to–Back Agreement be, and is hereby, denied;

The court further ORDERS that all requests made by Debtors in such motion for injunctive relief be, and are hereby, denied; and,

The court further ORDERS that by January 5, 2004, Debtors file a document showing cause why all injunctive relief granted by the bankruptcy court in rela-

court and the Interstate Commerce Commission in favor of Interstate Commerce Commission, noting that the Interstate Commerce Commission was "charged with the duty of preparing a plan that will be compatible to the public interest." *Id.* at 131, 66 S.Ct. 947

(internal quotation marks omitted). The significance of *Hoboken* to the instant action is diluted by the role the Bankruptcy Act assigned to the Interstate Commerce Commission in reorganization. *Id.*

tion to the Back–to–Back Agreement should not be dissolved.