**In re MIRANT CORPORATION, et al., Debtors.**

No. 4–03–CV–1242–A.

United States District Court, N.D. Texas, Fort Worth Division.

Dec. 9, 2004.

Judith Elkin, Haynes & Boone, Jack E. Pace, III, Robert A. Milne, Wayne A. Cross, White & Case, New York, NY, for Plaintiff.

Monica S. Blacker, Jason S. Brookner, Andrews & Kurth, Dallas, TX, Mark F. Sundback, Andrews & Kurth, Washington, DC, for Intervenor Plaintiff.

Sander L. Esserman, Stutzman Bromberg Esserman & Plifka, Dallas, TX, Donald E. Herrmann, Kelly, Hart & Hallman, Fort Worth, TX, Jonathan P. Guy, Roger Frankel, Swidler Berlin Shereff Friedman, Dennis Lane, Federal Energy Regulatory Commission, Washington, DC, for Defendants.

Grace Delos Reyes, James Bradford Ramsay, National Ass'n of Regulatory Utility Commissioners, Daniel M. Lewis, Michael L. Bernstein, Arnold & Porter, Daniel Mark Litt, Dickstein, Shapiro, Morin & Oshinsky, Washington, DC, Michael A. McConnell, Winstead, Sechrest & Minick, Stephen L. Tatum, Cantey & Hanger, Fort Worth, TX, for Movant.

### MEMORANDUM OPINION and ORDER

MCBRYDE, District Judge.

The United States Court of Appeals for the Fifth Circuit reversed a portion of the order the court rendered in the above-captioned action on December 23, 2003, which is reported as *In re Mirant Corp.*, 303 B.R. 304 (N.D.Tex.2003), and remanded for further proceedings. *In re Mirant Corp.*, 378 F.3d 511 (5th Cir.2004). Two issues the Fifth Circuit said must be dealt with at the outset on remand are, first, whether the so-called Back–to–Back Agreement is separate from the Asset Purchase and Sale Agreement for purposes of rejection under § 365 of the Bankruptcy Act (saying that "it is unclear whether or not the Back–to–Back Agreement is a separate agreement from the Asset Purchase and Sale Agreement for purposes of rejection," *id.* at 524), and, second, a definition of the standard to be applied in determining whether rejection should be authorized (explaining that "[u]se of the business judgment standard would be inappropriate in this case because it would not account for the public

interest inherent in the transmission and sale of electricity," *id.* at 525). This memorandum opinion and order deals with those two issues.

### I.

#### *Whether the Back–to–Back Agreement Is a Separate Agreement*

As the court noted earlier, the term "Back–to–Back Agreement" refers to certain rights and obligations that are a part of the Asset Purchase and Sale Agreement for Generating Plants and Related Assets dated June 7, 2000 (as amended and supplemented, the "APSA") between Potomac Electric Power Company ("PEPCO") and Mirant Corporation, then known as "Southern Energy, Inc." *In re Mirant Corp.*, 303 B.R. at 307–08. Reference is made to the opinion of the Fifth Circuit for a general description of the APSA. *In re Mirant Corp.*, 378 F.3d at 515.

■■■ Section 365 of the Bankruptcy Code provides that a debtor, subject to court approval, may reject any executory contract. 11 U.S.C. § 365(a). The intent is to allow the debtor "to relieve the bankruptcy estate of burdensome agreements which have not been completely performed." *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir.1996). However, "[w]here an executory contract contains several agreements, the debtor may not choose to reject some agreements within the contract and not others." *Id.; Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir.1985) (explaining that "the often-repeated statement that the debtor must accept the contract as a whole means only that the debtor cannot choose to accept the benefits of the contract and reject its burdens to the detriment of the other party to the agreement"). But, "[i]f a single contract contains separate, severable agreements the debtor may reject one agreement and not another." *Stewart Title*, 83 F.3d at 741.

■■■ Generally speaking, "an agreement is considered executory if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party." *Id.* (internal quotation marks omitted). The issue of rejection of a contract containing separate, severable agreements "relates only to those aspects of the contract[ ] which remain unfulfilled as of the date the petition is filed." *Id.* (internal quotation marks omitted). "Thus, where a single document embraces several distinct agreements, some of which are executory and some of which are fully or substantially performed, only the executory portions of the document are subject to rejection." *Id.* at 741–42.

■■■ Whether the Back–to–Back Agreement is severable from the APSA is to be determined by the non-bankruptcy legal rules applicable to the APSA. *See Stewart Title*, 83 F.3d at 739 (applying Texas law to determine severability); *In re Cafe Partners/Washington 1983*, 90 B.R. 1, 6 (Bankr.D.D.C.1988) (applying District of Columbia law). The APSA provides that it is to be "governed by and construed in accordance with the laws of the District of Columbia." Pepco App. filed 10/30/03 at APP 233 (APSA § 12.6).

The rights and obligations that constitute the Back–to–Back Agreement are executory. Each party has ongoing performance obligations. If either party were to discontinue performance, there would be a material breach of those rights and obligations, thereby excusing performance by the other party. Thus, the issue becomes whether those rights and obligations are severable from the remaining parts of the APSA.

Under the laws of the District of Columbia, "[w]hether a number of promises constitute one contract or more than one is *primarily a question of intention of the parties,"* Holiday Homes v. Briley, 122 A.2d 229, 232 (D.C.1956) (emphasis added); and, "[i]n ascertaining this intention, consideration may be given to whether the parties assented to all the promises as a single whole, and as to whether the consideration was given for each part as a separate unit or whether there was a single consideration covering the various parts," *id.* In *Bethea v. Investors Loan Corp.,* the District of Columbia Court of Appeals elaborated on the principles expressed in *Holiday Homes* by the statement that "the *essential test* is whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out." 197 A.2d 448, 450 (D.C.1964) (citation and internal quotation marks omitted) (emphasis added). *See also Royal McBee Corp. v. Bryant,* 217 A.2d 603, 607 (D.C.1966).

In a more recent opinion, the District of Columbia Court of Appeals explained:

There is no set answer to the question of when a contract is divisible and when it is entire. There are merely suggested factors to be considered in resolving the issue. Consideration may be given to: (1) whether the parties assented to all the promises as a single whole; (2) whether there was a single consideration covering various parts of the agreement or whether consideration was given for each part of the agreement; and (3) whether performance of each party is divided into two or more parts, the number of parts due from each party being the agreed exchange for a corresponding part by the other party.

*Howard Univ. v. Durham,* 408 A.2d 1216, 1219 (D.C.1979) (citations omitted). This language was quoted with approval in *Cahn v. Antioch Univ.,* 482 A.2d 120, 129–30 (D.C.1984).

In formulating its severability rules, the District of Columbia Court of Appeals relied on the language now found in section 863 of 6 Williston on Contracts (3d ed.1962), which begins with the following explanations:

The essential test to determine whether a number of promises constitute one contract or more than one is simple. It can be nothing else than the answer to an inquiry whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out.

(footnote omitted). *See Royal McBee,* 217 A.2d at 607; *Bethea,* 197 A.2d at 450.

While there is no set answer under District of Columbia laws as to when a contract is divisible, the District of Columbia decisions make clear that the paramount consideration is the intention of the parties. When the controlling laws are applied by the court to the undisputed facts of this case, the court must conclude that the Back–to–Back Agreement is not severable from the other parts of the APSA. The many promises in the APSA, including those found in the Back–to–Back Agreement, were assented to by the parties as a part of the whole APSA. The final proposal of Mirant Corporation (then Southern Energy, Inc.) for purchase of Pepco's generating resources, which led to the APSA, makes this intent clear:

Southern Energy is offering to purchase all of the resources (generating plants, power purchase agreements and transition power agreements) for a net payment to Pepco of $3,071,897,000 (including the value of fuel, inventories and

permitted capital expenditures). As requested in the bid instructions, the equivalent of this amount is set forth in the attached Schedule A—Final Proposal Bid Form. As indicated on that form, *Southern Energy's proposal related to the Power Purchase Agreements ("PPAs"), and their related contingent liabilities, is conditioned on Southern Energy acquiring the generating plants.*

Southern Energy understands that the PPAs may be severed from the other resources, and that in such an event the requirements obligation under the Transition Power Agreements ("TPAs") will be allocated among the purchasers as set forth in the bid instructions. If both the Ohio Edison PPA and the Panda–Brandywine PPA (and the corresponding portion of the TPA obligations per the bid instructions) are severed from the other resources, Southern Energy's offer for the remaining resources would be $3,200,632,000 (net to Pepco and including the value of fuel, inventories and permitted capital expenditures).

Finally, pursuant to the bid instructions, the purchase price has been broken down into various components. This breakdown is for informational purposes only as *this proposal assumes a single payment for all assets in lieu of separate payments under different transaction documents,* thus preserving the most tax-efficient structure and the greatest value. The purchase price will be payable in cash in U.S. dollars on the closing date.

Pepco App. filed 10/30/03 at APP 19–20 (emphasis added).

As the Fifth Circuit noted, the parties, in fact, did agree to a single consideration for all assets. *In re Mirant Corp.,* 378 F.3d at 515 (recognizing that "Pepco agreed to sell its electric generation facilities and assign most of its power purchase agreements to Mirant in June 2000 for approximately $2.65 billion in the [APSA]." (abbreviated reference and footnote omitted)). And, Section 12.10 of the APSA confirms that the parties, in fact, did assent to the provisions of the APSA, including all of the Schedule 2.4 rights and obligations, as a single whole contract:

SECTION 12.10 *Entire Agreement.* This Agreement, the Confidentiality Agreement and the Ancillary Agreements including the Exhibits, Schedules, documents, certificates and instruments referred to herein or therein and other contracts, agreements and instruments contemplated hereby or thereby, embody the entire agreement and understanding of the Parties in respect of the transactions contemplated by this Agreement. . . .

Pepco App. filed 10/30/03 at APP 234 (APSA § 12.10).

The court is satisfied that the furthest thing from the minds of the parties when they entered into the APSA, and agreed to a contract price of $2.65 billion, was that the set of rights and obligations that constitute the Back–to–Back Agreement would be treated as contractual commitments separate from and independent of Pepco's sale to Debtors of its electric generation facilities. There simply would not have been a contract if the Back–to–Back rights and obligations had been the only things bargained for. Indeed, in arriving at the total net purchase price, Mirant Corporation assigned negative values to the power purchase agreements that became subjects of the Back–to–Back Agreement. *Id.* at APP 25.

Debtors' reliance on the APSA's severability provision (Section 12.11) is misplaced. By that section the parties narrowly and specifically limited severability to a situation where a provision of the APSA was declared invalid, illegal, or con-

trary to law or public policy. *Id.* at APP 234 (APSA § 12.11). If the severability provision has any relevance to the issue under discussion, it is that the provision tends to show that the parties did not intend for individual provisions to be severable unless severability was expressly authorized by the provision.

Performance under the Back–to–Back Agreement undoubtedly could now be separated from performance under the remaining parts of the APSA in the sense that a breach of the Back–to–Back Agreement would not affect the remaining parts, and there would be an appropriate method of measuring the damages suffered by Pepco from such a breach. Particularly is this so in the light of the suggestion of the Fifth Circuit that the damages that would be suffered by Pepco from a breach of the Back–to–Back Agreement can be measured by the rates approved by the Federal Energy Regulatory Commission ("FERC"). *In re Mirant Corp.,* 378 F.3d at 522. However, severability in that sense fails to meet the intent-of-the-parties standard, or pass the "essential test," under the laws of the District of Columbia.

Having received the benefit of the other features of the APSA, Debtors should not be permitted at this time to reject to the detriment of Pepco the burdens imposed on Debtors by the Back–to–Back feature of the APSA. Therefore, the motion for authority to reject the Back–to–Back Agreement is being denied.

## II.

### *The Standard That Would be Applied*

Even though, considering the court's ruling on the first issue, the second issue is moot, the court is making known its views on that issue. In the event of a reversal of the court's ruling on the first issue, the parties will know the standard to be applied.

■ The decision on a motion to reject under § 365 generally is left to the business judgment of the debtor. *In re Mirant Corp.,* 378 F.3d at 524 n. 5. In the instant action, the Fifth Circuit concluded that the business judgment standard would be inappropriate, explaining:

Use of the business judgment standard would be inappropriate in this case because it would not account for the public interest inherent in the transmission and sale of electricity.

Therefore, upon remand, the district court should consider applying a more rigorous standard to the rejection of the Back–to–Back Agreement. If the district court decides that a more rigorous standard is required, then it might adopt a standard by which it would authorize rejection of an executory power contract only if the debtor can show that it "burdens the estate, [ ] that, after careful scrutiny, the equities balance in favor of rejecting" that power contract, and that rejection of the contract would further the Chapter 11 goal of permitting the successful rehabilitation of debtors. *See* [NLRB v.] Bildisco, 465 U.S. [513] at 526–27[, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)]. When considering these issues, the courts should carefully scrutinize the impact of rejection upon the public interest and should, *inter alia,* ensure that rejection does not cause any disruption in the supply of electricity to other public utilities or to consumers. *Cf. id.* at 527[, 104 S.Ct. 1188] (requiring the bankruptcy court to balance the interests of the debtor, the creditors and the employees when determining what constitutes a successful rehabilitation). The bankruptcy court has already indicated that it would include FERC as a party in interest for all purposes in this case

under 11 U.S.C. § 1109(b) and Fed. R. Bankr.P.2018. We presume that the district court would also welcome FERC's participation, if this case is not referred back to the bankruptcy court. Therefore, FERC will be able to assist the court in balancing these equities.

*Id.* at 525–26 (footnote omitted).

The court has concluded that, in the light of the Fifth Circuit's remarks, if the definition of a standard for approval of rejection by Debtors of the Back–to–Back Agreement becomes important in this case, the standard should be as follows:

 To be entitled to an order authorizing rejection of the Back–to–Back Agreement, Debtors must prove that it burdens the bankrupt estates, that, after careful scrutiny and giving significant weight to comments and findings of the FERC relative to the effect such a rejection would have on the public interest inherent in the transmission and sale of electricity in interstate commerce, the equities balance in favor of rejecting the Back–to–Back Agreement, and that rejection of the Back–to–Back Agreement would further the Chapter 11 goal of permitting the successful rehabilitation of Debtors.

 As the Fifth Circuit has suggested, when applying this standard, the court would carefully scrutinize the impact of rejection upon the public interest and would, *inter alia,* ensure that rejection will not cause any disruption in the supply of electricity to other public utilities or to consumers or lead to unjust or excessive rates. If rejection would compromise the public interest in any respect, it would not be authorized unless Debtors show that they cannot reorganize without the rejection. Before authorizing a rejection, the court would give the FERC an opportunity to participate as a party in interest for all purposes in this case under 11 U.S.C.

§ 1109(b) and FED. R. BANKR. P.2018(a), and would afford the FERC an opportunity to engage in appropriate inquiry to enable it to evaluate the effect that such a rejection would have on the public interest.

### III.

#### *Order*

Consistent with the foregoing,

The court ORDERS that Debtors' motion, as amended, for order authorizing Debtors to reject the Back–to–Back Agreement be, and is hereby, denied.