United States Court of Appeals,

Fifth Circuit.

No. 95-20524.

STEWART TITLE GUARANTY COMPANY, Plaintiff-Appellant,

v.

OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY, formerly known as Title Insurance Co.;  Land Title Company of Dallas, doing business as Southwest Land Title Company, Defendants-Appellees.

May 29, 1996.

Appeal from the United States District Court for the Southern District of Texas.

Before KING, DAVIS and BARKSDALE, Circuit Judges.

PER CURIAM:

Stewart Title Guaranty Company ("Stewart Title") appeals the district court's granting of summary judgment against Stewart Title and in favor of Old Republic National Title Insurance Company f/k/a Southwest Title Insurance Company of Minnesota and Land Title Company of Dallas d/b/a Southwest Land Title Company (collectively "Southwest"), in a suit brought by Stewart Title to enforce certain contractual rights purchased by Stewart Title from a bankruptcy trustee and derived from a personal property lease agreement that had been rejected by the trustee pursuant to 11 U.S.C. § 365.  We reverse.

I. BACKGROUND

With respect to their competing motions for summary judgment in the district court, Stewart Title and Southwest stipulated to certain facts.  The stipulated facts may be summarized as follows:  In November 1970, Dallas Title Company ("Dallas Title"), as lessor,

1

and Dallas-Texas-National Title Company ("DTNT"), as lessee, entered into a thirty-two year lease agreement (the "Lease") for the personal property in an abstract plant owned by Dallas Title.[1] The abstract plant contained abstracts, records, files, computer-stored material, and other property necessary to the title-insuring and abstract business. In return for use of the abstract plant, Dallas Title agreed to pay $3000 a month and certain taxes levied or based on the plant, to purchase insurance, and to maintain the plant by means of day-by-day posting of all records pertaining to the business of abstracting. The agreement provided that all additions to the plant became the property of the lessor, but that, upon termination of the Lease, Dallas Title could copy for its own use any of the records pertaining to matters filed in Dallas County, Texas since November 30, 1961 (the "Reproduction Rights").[2] The Lease terminated a previous lease between Dallas

---

The Lease was incorporated by reference in the stipulated facts. Certain other peripheral rights and duties were enumerated in the Lease: Paragraph 6, for example, provided that, pursuant to the provisions of a separate existing contract, the lessee would act as exclusive agent for Dallas Title & Guaranty Company [sic].

Paragraph Four of the Lease provided:

Upon termination of this lease *for any reason* (a) Lessee at its cost and expense shall have the privilege of making copies of any material constituting the leased property to the extent that it pertains to matters filed in Dallas County, Texas since November 30, 1961, and Lessee shall have the privilege for a period of 30 days from date of termination of this lease of reproducing all of the computer records and thereafter retaining as its own property and for its own unrestricted use all copies so made, even though such computer records may include items bearing date prior to November 30, 1961, and (b) Lessee shall have

2

Title and DTNT dated November 1, 1966.

On June 20, 1990, DTNT filed for protection under Chapter 11 of the Bankruptcy Code.  The proceeding was subsequently converted to a Chapter 7 liquidation and a trustee was appointed.  On June 10, 1991, in an agreed order signed by the bankruptcy court, the trustee rejected the Lease pursuant to § 365 of the Bankruptcy Code.[3]  The trustee held an auction to sell the Reproduction Rights as a "potential asset" of the bankruptcy estate.  Southwest, the successor and assignee of Dallas Title, made an offer to purchase the Reproduction Rights for $26,000.  Stewart Title bid $30,000. The bankruptcy trustee accepted Stewart Title's offer.  The bankruptcy court approved the sale of the Reproduction Rights to Stewart Title, and on September 24, 1991, the trustee executed a Bill of Sale.[4]

When Southwest refused to allow Stewart Title to exercise the

> the right of examination, for use in connection with the conduct of its business, for a period of five years from date of termination, of all of the base title files comprising a part of the leased property.

(emphasis added).  The three words "for any reason" apparently were added to the text at the last moment.  They were typed in above the body of the text and both parties to the Lease initialed the addition.

Section 365(a) provides that a trustee may "assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).

Incorporated by reference in the stipulated facts, the Bill of Sale provided that the trustee granted, bargained, sold and transferred "all of his interest, if any, in the copy and reproduction rights of computer title records as detailed in the personal property lease agreement dated November, 1970, effective December 1, 1970, through January 1, 2002, by and between [Dallas Title] and [DTNT]."

Reproduction Rights, Stewart Title brought suit against Southwest in the 127th Judicial District Court of Harris County, Texas, asserting a claim for breach of the Lease and seeking specific performance. Southwest removed the case to the United States District Court for the Southern District of Texas. The parties filed cross motions for summary judgment on the limited legal issue of the enforceability of the Reproduction Rights that Stewart Title had purchased from the trustee.[5] Finding that the trustee's rejection of the Lease excused Southwest from its obligations to the lessee, the district court concluded that the Reproduction Rights were unenforceable. On June 9, 1995, the district court entered an order granting summary judgment in favor of Southwest and against Stewart Title. Three weeks later, Stewart Title timely filed a notice of appeal.

## II. ANALYSIS

We review the granting of summary judgment *de novo,* applying the same criteria used by the district court in the first instance. *Norman v. Apache Corp.,* 19 F.3d 1017, 1021 (5th Cir.1994); *Conkling v. Turner,* 18 F.3d 1285, 1295 (5th Cir.1994). First, we consult the applicable law to ascertain the material factual issues. *King v. Chide,* 974 F.2d 653, 655-56 (5th Cir.1992). We then review the evidence bearing on those issues, viewing the facts and inferences to be drawn therefrom in the light most favorable to

---

Stewart Title sought a partial summary judgment upholding the enforceability of the Reproduction Rights, after which the case would have proceeded against Southwest on the merits. Southwest sought a final summary judgment on this limited legal issue.

the nonmoving party. *Lemelle v. Universal Mfg. Corp.,* 18 F.3d 1268, 1272 (5th Cir.1994); *FDIC v. Dawson,* 4 F.3d 1303, 1306 (5th Cir.1993), *cert. denied,* --- U.S. ----, 114 S.Ct. 2673, 129 L.Ed.2d 809 (1994). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The sole issue on appeal is whether the Reproduction Rights acquired by Stewart Title are enforceable as a matter of law. It is uncontested that, under applicable choice-of-law principles, Texas law governs in this case because the subject matter of the lease, the place of performance of the lease, and the residence and place of business of the parties are all in Texas. *Neo Sack, Ltd. v. Vinmar Impex, Inc.,* 810 F.Supp. 829, 838-39 (S.D.Tex.1993) (listing factors to consider in determining applicable law). The district court concluded that under Texas law the Reproduction Rights are not enforceable because the bankruptcy trustee's rejection of the Lease constituted a material breach that excused Southwest from its contractual obligations. *Oil Country Specialists, Ltd. v. Philipp Bros., Inc.,* 762 S.W.2d 170, 179 (Tex.App.—Houston [1st Dist.] 1988) (noting that when one party materially breaches a contract, the other party is discharged from his obligation to perform), *writ denied,* 787 S.W.2d 38 (Tex.1990). Stewart Title maintains that the Reproduction Rights are enforceable despite the trustee's rejection.

5

Stewart Title argues that the Lease consisted of two severable agreements: (1) an executory agreement regarding the use of the records and other materials contained in the abstract plant (the "Use Rights"); and (2) an executed agreement regarding the Reproduction Rights. Stewart Title contends that the Reproduction Rights vested in the lessee on the effective date of the Lease and thereafter were an enforceable and assignable asset. According to Stewart Title, because the Reproduction Rights required no further performance on the part of the lessee, the bankruptcy trustee's § 365 rejection pertained only to the Use Rights—the executory portion of the Lease. Therefore, the first question we must answer is whether the Lease was a severable contract such that the fulfilled portion would remain enforceable, notwithstanding the bankruptcy trustee's rejection.

A. Severability

A severable contract "includes two or more promises which can be acted on separately such that the failure to perform one promise does not necessarily put the promisor in breach of the entire agreement." Black's Law Dictionary 1373-74 (6th ed. 1990). Black's Law Dictionary defines divisible and severable contracts in similar terms.[6] Under Texas law, a contract is divisible, or severable, when one party's performance consists of more than one

_____

A divisible contract is defined as: "One which is in its nature and purpose susceptible of division and apportionment, having two or more parts in respect to matters and things contemplated and embraced by it, not necessarily dependent upon each other nor intended by the parties so to be." Black's Law Dictionary 479 (6th ed. 1990). Virtually the same language is used to define "severable contract." *Id.* at 1373-74.

6

"distinct and separate item[ ] and the price paid by the other party is apportioned to each item." *In re Ferguson,* 183 B.R. 122, 124 (Bankr.N.D.Tex.1995) (quoting *Johnson v. Walker,* 824 S.W.2d 184, 187 (Tex.App.—Fort Worth 1991, no writ)). No one test or rule of law can be used to ascertain whether a contract is divisible or indivisible. *Johnson,* 824 S.W.2d at 187. "Determination of the issue depends primarily on the intention of the parties, the subject matter of the agreement, and the conduct of the parties." *Id.* (citations omitted).

The intent of the parties is the principal determinant of divisibility. *Lake LBJ Mun. Util. Dist. v. Coulson,* 771 S.W.2d 145, 153 (Tex.App.—Austin 1988), *rev'd on other grounds,* 781 S.W.2d 594 (Tex.1989); *see also Sheline v. Dun & Bradstreet Corp.,* 948 F.2d 174, 177 (5th Cir.1991) (finding that unenforceable covenant not to compete could not be severed from the remainder of a severance agreement because severability "is governed by the intent of the parties"); *Nat'l Iranian Oil Co. v. Ashland Oil, Inc.,* 817 F.2d 326, 333 (5th Cir.) (noting that "whether [an agreement] is entire or severable turns on the parties' intent at the time the agreement was executed, as determined from the language of the contract and the surrounding circumstances"), *cert. denied,* 484 U.S. 943, 108 S.Ct. 329, 98 L.Ed.2d 356 (1987). In construing a contract, its unambiguous language alone will generally be deemed to express the intent of the parties. *Norman v. Apache Corp.,* 19 F.3d 1017, 1024 (5th Cir.1994). "The issue as to severability is whether or not the parties would have entered into the agreement

7

absent the [severed] parts." *McFarland v. Haby,* 589 S.W.2d 521, 524 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.) (holding that contract was unseverable where party would not have signed contract absent illegal parts).

In the instant case, the terms of the Lease evidence the parties' intent that the Use Rights and the Reproduction Rights be distinct and separate items. The Use Rights permitted the lessee to use the abstract books, records, and equipment of the plant but not to "duplicate in any manner any material constituting a part of said plant or permit anyone to make copies therefrom." The Reproduction Rights—the privilege to make copies after termination—served as the natural complement to the Use Rights. In exchange for these two sets of rights, the lessee agreed to provide two kinds of consideration: (1) monetary outlays—payment of $3000 a month rent, taxes, and insurance premiums; and (2) material additions to the plant—daily posting of new information relevant to the business.

The district court surmised that severance of the Lease into two separate agreements would lead to absurd results. The court reasoned that:

> Stewart's argument that the lease consists of two divisible agreements would logically permit the lessee to have signed the lease with the premeditated intention of not performing its contractual obligations to pay rent, taxes, and maintenance, to have breached the lease by continuing to possess and use the plant until it expired or the lessor terminated it, and then to enjoy a right to copy the title plant, all for free.

We disagree.

These parties knew each other and were bound by at least one

8

preexisting contractual relationship.  In addition to the agency agreement mentioned in Paragraph 6, the Lease makes reference in Paragraph 12 to a previous lease between the same parties dated November 1, 1966.  In light of the fact that all additions to the plant became the property of the lessor, it is clear that the parties included the Reproduction Rights in the Lease to preserve the value to the lessee of the lessee's daily contributions to the corpus of the abstract plant.

Moreover, we believe that the parties' purposeful addition to the Lease of the words "for any reason," is strongly indicative of their intent to preserve the lessee's sweat equity in the abstract plant.  Paragraph 4 of the Lease provides that the lessee shall have the privilege of making copies of certain materials "[u]pon termination of th[e] lease for any reason."  By the terms of the Lease, the parties intended to protect the rights of the lessee to reproduce materials with which the lessee had enriched the plant day-by-day, regardless of the circumstances that led to termination.  The parties expressly manifested their intention that the lessee's Reproduction Rights survive breach and termination.  Thus, we find that the intent of the parties was that the lessee's Reproduction Rights be severable.

The second of *Johnson* 's severability factors—the subject matter of the agreement—weighs in favor of severability. Although, a careless glance might suggest that the "subject matter" of the Lease is uniform and undifferentiated, the two agreements encompassed by the Lease are distinct and clearly defined.  One

9

deals with the use, but not the reproduction, of all of the abstract materials;  the other deals with the reproduction of only the abstract materials added since 1961 and the presumably few computer records predating 1961.

Finally, the third severability factor—the conduct of the parties—also favors a finding of severability.  In its conclusion that severability would lead to absurd results, the district court relied on a scenario wherein the lessee, in order to obtain the Reproduction Rights "for free," might have signed the Lease with the premeditated intention of immediately breaching it.  In fact, the district court's speculative conclusion is undermined by the actual conduct of the parties.  The parties enjoyed a presumably healthy prior relationship as evidenced by the previous lease referenced in Paragraph 12.  Moreover, not only did the breach contemplated by the district court not occur, but a history of good-faith performance by both parties persisted for approximately twenty years until the bankruptcy filing.

Additionally, a type of conduct that is particularly telling in an inquiry such as this is the method of payment arranged by the parties.  *See Ferguson,* 183 B.R. at 126 (finding that parties conducted themselves as though contract was unseverable where "both parties contemplated an entire contract through the type of payment they arranged").  "Where the subject matter of the contract is divisible and the consideration is apportioned, these qualities are consistent with and indicative of a severable contract." *Id.; see also Budge v. Post,* 544 F.Supp. 370, 382 (N.D.Tex.1982) (finding

10

that a settlement was not a divisible contract where "the consideration supporting the [ ] Settlement was neither expressly nor impliedly apportioned with respect to each promise made by the parties"); *Lake LBJ,* 771 S.W.2d at 153 (holding that construction contract was divisible where it provided for separate payments, each roughly proportionate to separate kinds of work required).

In this case, the Lease called for two separate kinds of consideration, each kind appropriate to one of the two types of rights granted: monetary payments for the Use Rights; day-by-day updating for the Reproduction Rights. We find that the parties, at least impliedly, apportioned the consideration with respect to each promise.

The district court bases its determination of the Lease's indivisibility, in part, on two other factors: whether there was a single assent to the entire transaction; and whether the promises included in the contract "are so interdependent that the parties would not have entered into one without the other." *Budge,* 544 F.Supp. at 381. We do not believe that these factors are determinative in this instance. Far more compelling is the clear intent of the parties, their conduct, and the subject matter of the two major agreements contained within the lease.

We believe that a determination of indivisibility "would result in a new and different contract not intended by the parties." *McFarland,* 599 S.W.2d at 524. Thus, based on the way that the parties structured the Lease, we conclude that the Lease was a severable contract, divisible into two separate agreements.

11

The next question is whether the trustee's rejection of the Lease, pursuant to § 365, rendered the Reproduction Rights unenforceable notwithstanding their severability.

B. Section 365

Section 365 of the Bankruptcy Code provides that the bankruptcy trustee may reject any executory contract or unexpired lease of the debtor. 11 U.S.C. § 365(a). "This provision allows a trustee to relieve the bankruptcy estate of burdensome agreements which have not been completely performed." *In re Murexco Petroleum, Inc.,* 15 F.3d 60, 62 (5th Cir.1994). The Code states that, except in certain narrowly circumscribed instances,[7] rejection of an executory contract or lease constitutes a material breach.[8] 11 U.S.C. § 365(g). As a legal fiction, such a breach is deemed to have occurred on the day immediately prior to the commencement of the bankruptcy so rejection claims are treated as prepetition claims, 11 U.S.C. §§ 365(g)(1) & 502(g), and because the parties' rights are deemed prepetition, state law governs the rights stemming from the breach.[9] *In re Audra-John Corp.,* 140 B.R.

Section 365(g) notes that rejection constitutes breach except as provided in subsections (h)(2) and (i)(2). 11 U.S.C. § 365(g). These subsections deal with the rejection of timeshare plans and contracts for the sale of real property. 11 U.S.C. § 365(h)(2) & (i)(2).

Under § 365, such a breach does not result in the automatic termination of the contract or lease. *In re Austin Dev. Co.,* 19 F.3d 1077, 1082 (5th Cir.) (citing *In re Continental Airlines,* 981 F.2d 1450, 1459 (5th Cir.1993)), *cert. denied,* --- U.S. ----, 115 S.Ct. 201, 130 L.Ed.2d 132 (1994).

In the case at bar, Paragraph 7 of the Lease provided that in the event that the lessee defaulted in any of the required payments the lessor would have the right to terminate the

12

752, 757 (Bankr.D.Minn.1992).

"It is well established that as a general proposition an executory contract must be assumed or rejected in its entirety." *In re Camptown, Ltd.,* 96 B.R. 352, 355 (Bankr.M.D.Fla.) (citations omitted), *order amended on other grounds,* 98 B.R. 596 (Bankr.M.D.Fla.1989). Where an executory contract contains several agreements, the debtor may not choose to reject some agreements within the contract and not others. *In re Cutters, Inc.,* 104 B.R. 886, 888 (Bankr.M.D.Tenn.1989) (citation omitted).

Although the Code does not define "executory contract," generally an agreement is considered executory "if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party." *Murexco,* 15 F.3d at 62-63. There is no dispute that the Use-Rights portion of the Lease was executory. As to the Reproduction Rights, arguably the lessee had substantially performed its obligations at the time of the bankruptcy filing and the Reproduction Rights agreement could be considered executed.

If a single contract contains separate, severable agreements the debtor may reject one agreement and not another. *Cutters,* 104 B.R. at 889 (citation omitted). "[T]he issue of assumption or rejection of such contracts relates only to those aspects of the contracts which remain unfulfilled as of the date the petition is filed." *In re Tomer,* 128 B.R. 746, 756 (Bankr.S.D.Ill.1991)

contract.

13

(citation omitted), *aff'd,* 147 B.R. 461 (S.D.Ill.1992). Thus, where a single document embraces several distinct agreements, some of which are executory and some of which are fully or substantially performed, only the executory portions of the document are subject to rejection.

Where a trustee rejects a severable contract containing both an executed and an executory agreement, such rejection is not equivalent to the breach or rescission of the executed agreement. *Id.* Nor does it "require the undoing or reversal of already executed portions of the contract[ ]. Rather, the executed portions of the contract[ ] remain intact, and property rights acquired under the contract[ ] prior to filing became property of the estate despite the trustee's rejection of unperformed obligations of the contract[ ]." *Id.* (citation omitted) (holding that debtor's claim to money owed for prepetition services under personal services contract was an asset of debtor's estate which passed to trustee despite trustee's subsequent rejection of the contract).

Thus, in the instant case, when the bankruptcy trustee rejected the Lease pursuant to § 365 the debtor materially breached the Lease only to the extent that the Lease remained executory—i.e., only in regard to the Use Rights. We conclude that, as a matter of law, the rejection of the Lease did not render the Reproduction Rights acquired by Stewart Title unenforceable.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court

14

is REVERSED and the case is REMANDED for further proceedings not inconsistent with this opinion.