# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
October 19, 2010

Lyle W. Cayce
Clerk

No. 09-40307

In the Matter of:  SCOPAC;
SCOTIA DEVELOPMENT LLC;
SALMON CREEK LLC; SCOTIA INN INC;
BRITT LUMBER COMPANY, INC;
THE PACIFIC LUMBER COMPANY;
STEVE WILLS TRUCKING AND LOGGING LLC,

Debtors

BANK OF NEW YORK TRUST COMPANY NA, as Indenture trustee for the Timber Notes ("Indenture Trustee");
CSG INVESTMENTS INC;
ANGELO, GORDON & COMPANY L.P.;
AURELIUS CAPITAL MANAGEMENT, L.P.;
DAVIDSON KEMPNER CAPITAL MANAGEMENT LLC;
 SCOTIA REDWOOD FOUNDATION INC,

Appellants,

v.

PACIFIC LUMBER COMPANY;
SCOTIA PACIFIC LLC;
MARATHON STRUCTURED FINANCE FUND LP;
MENDOCINO REDWOOD COMPANY LLC;
COMMITTEE OF UNSECURED CREDITORS;
BANK OF AMERICA,

Appellees

No. 09-40307

ANGELO, GORDON & CO LP;
AURELIUS CAPITAL MANAGEMENT LP;
DAVIDSON KEMPNER CAPITAL MANAGEMENT LLC,

Appellants,

v.

MARATHON STRUCTURED FINANCE FUND LP;
MENDOCINO REDWOOD COMPANY LLC;
COMMITTEE OF UNSECURED CREDITORS;
BANK OF AMERICA;
SCOTIA PACIFIC LLC;
PACIFIC LUMBER COMPANY,

Appellees

———————

CSG INVESTMENTS, INC,

Appellant,

v.

SCOTIA PACIFIC LLC; PACIFIC LUMBER COMPANY,

Appellees

———————

SCOTIA REDWOOD FOUNDATION, INC.,

Appellant,

v.

SCOTIA PACIFIC LLC; PACIFIC LUMBER COMPANY,

Appellees

No. 09-40307

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, Chief Judge, PRADO, Circuit Judge, and OZERDEN,[*] District Judge.

EDITH H. JONES, Chief Judge:

This appeal involves a dispute over compensation for diminution in the value of collateral during the pendency of a Chapter 11 bankruptcy. The appellants, holders of notes secured by the timber and non-timber assets of the Scotia Pacific Co., LLC ("Scopac"), seek review of the district court's dismissal of their appeal for lack of subject matter jurisdiction and contend that the bankruptcy court erred in denying their "superpriority" administrative claim on the bankruptcy estate. 11 U.S.C. § 507(b). The Appellees, supporters of Scopac's reorganization plan, argue that the district court lacked jurisdiction due to the Noteholders' separate appeal of the plan confirmation order, an order this court affirmed, in large part, last year. *See In re Pacific Lumber Co.*, 584 F.3d 229 (5th Cir. 2009) (Jones, C.J.). They further assert that the bankruptcy court correctly calculated the value of the Noteholders' administrative claim: zero. We hold that jurisdiction exists and, on the merits, uphold an administrative priority claim of $29.7 million.

## I. BACKGROUND

In January 2007, the Pacific Lumber Company ("Palco") and several of its subsidiaries, including Scopac, filed petitions for relief under Chapter 11 of the Bankruptcy Code. Scopac's principal assets were 200,000 acres of redwood timberland and cash and cash equivalents on hand. There were three major

_____

[*] District Judge of the Southern District of Mississippi, sitting by designation.

creditors: the Noteholders were owed $714 million and had a lien on substantially all of Scopac's's assets; Bank of America was owed $36.2 million and had a senior lien on the same assets; and Marathon, a private equity fund, was owed $160 million.

While the automatic stay was in place, the bankruptcy court entered a series of cash collateral orders authorizing Palco to employ creditors' assets for the purpose of preserving the value of the estate and requiring it to provide adequate protection to those creditors in return.[1] These orders granted Bank of America and the Noteholders a lien on all property of the estate not already subject to their existing liens and a superpriority administrative claim to the extent of the post-petition diminution of their interests.

In January 2008, the bankruptcy court entered an order terminating the period of exclusivity during which only the debtors had been allowed to propose plans for reorganization. *See* 11 U.S.C. § 1121. Marathon partnered with the Mendocino Redwood Company, Inc., a timber company, to propose a reorganization plan for Palco and Scopac. Their plan allowed for the payment of the current value of the Noteholders' secured claim on the collateral, the payment of the principal and non-default interest on the Bank of America claim, the payment of a portion of Scopac's trade creditors' debt, and the payment of a portion of the debt owed to Palco's unsecured creditors. Marathon would convert the $160 million debt owed to it into equity, and Marathon and MRC would contribute $580 million in cash to the new companies. Ultimately, this plan, with slight amendments, was confirmed, and Marathon and MRC effectively purchased the reorganized companies out of bankruptcy.

---

[1] "Adequate protection" is a term of art in bankruptcy practice, defined in 11 U.S.C. § 361 and applied in §§ 362(d) and 363(e); in short, it is a payment, replacement lien, or other relief sufficient to protect the creditor against diminution in the value of his collateral during the bankruptcy.

No. 09-40307

The major sticking point at confirmation was the confirmation-date value of Scopac's timberland and, by extension, the value of the Noteholders' secured claim. In April and May of 2008, the bankruptcy court held several hearings on the proposed plan, at which both MRC/Marathon and the Noteholders presented expert testimony on the value of the timberland at the time of confirmation. The higher the value, the more that MRC and Marathon would have to pay to satisfy the Noteholders' claim.

In partial response to the proposed plan's low-ball valuation of the timberland, the Noteholders filed a motion for a superpriority administrative expense claim pursuant to 11 U.S.C. § 507(b). They contended that the value placed on their timberland under the terms of the MRC/Marathon plan reflected a substantial post-petition decline for which they should be compensated. *See* 11 U.S.C. §§ 363(e), 361.

In June, the bankruptcy court issued a 119-page decision containing findings of fact and conclusions of law on the MRC/Marathon plan. The court found that the timberland was worth no more than $510 million—far less than the face value of the debt held by the Noteholders. (The value of the timberland at confirmation, a subject of the prior appeal, is not at issue in the present action.[2]) It delayed entry of the confirmation order, however, to consider the Noteholders' § 507(b) claim.

To that end, the court conducted hearings in late June and early July at which the parties presented evidence and expert testimony on the value of Scopac's timberland and other assets on the petition date. According to undisputed testimony, the Noteholders' collateral included Scopac's $48.7 million in non-timber assets, both cash and equivalents, on the petition date. From this,

---

[2] The valuation was challenged and upheld in the appeal of the confirmation order. The $510 million figure, this court found, "represents a reasonable accommodation of complex and sometimes contradictory testimony." 584 F.3d at 248.

5

the court deducted $36.2 million for Bank of America's higher-priority claim and the $8.9 million that Scopac had paid the Noteholders' representatives for services during the bankruptcy. That left the Noteholders with a net secured interest of $3.6 million in non-timber collateral.

The parties' experts clashed over the value of the timberland on the petition date. The Noteholders' expert, James Fleming, testified that its value had dropped significantly over the pendency of the bankruptcy due to a sharp decline in timber prices and reduced harvest estimates. He proposed a petition-date value of $646 million—still less than the full value of the Noteholders' claim. The appellees' expert, Richard LaMont, testified that the timberland had actually appreciated since Scopac filed for bankruptcy due to a decline in the discount rate applicable to long-term timber investments.

The bankruptcy court denied the Noteholders' § 507(b) motion. It largely credited LaMont's testimony, concluding that the timberland had not declined in value during the bankruptcy. Thus, the Noteholders were, on net, entitled to $513.6 million: $510 million for the timberland and $3.6 million for other collateral. MRC/Marathon agreed to modify its plan to provide for payment of that amount, rendering unnecessary § 507(b) relief because the value of the claim was zero.

On July 8, the modified MRC/Marathon plan was confirmed. The court also entered a separate "Final Order" denying the § 507(b) motion.

The Noteholders filed separate notices of appeal to the district court from the confirmation order and the § 507(b) order. In bankruptcy court, the Noteholders also petitioned for a stay of confirmation, as well as direct appeal

of the confirmation order to this court. The stay was not granted; direct appeal was.[3]

In February 2009, the district court dismissed the Noteholders' appeal of the § 507(b) order. This court's consideration of the appeal of the confirmation order, it held, divested it of jurisdiction over the appeal of the § 507(b) order, because the § 507(b) order "is an integral part of the Confirmation Order." The Noteholders moved for rehearing, requesting that the court vacate its dismissal or, pursuant to 28 U.S.C. § 1631, transfer the § 507(b) appeal to this court. The district court refused to employ § 1631.

In September 2009, this court largely affirmed the confirmation order, based on its review of the bankruptcy court's factual findings on valuation at the time of confirmation. 584 F.3d at 247–49. The opinion mentioned, but did not discuss or rule upon, the § 507(b) hearings and order. *Id.* at 239 n.11–12, 249 n.24.

## II. STANDARD OF REVIEW

Whether a district court possesses subject matter jurisdiction is a question of law reviewed *de novo* on appeal. *Young v. Hosemann*, 598 F.3d 184, 187 (5th Cir. 2010).

This court reviews the decision of a district court, sitting as an appellate court, by applying the same standards of review to the bankruptcy court's findings of fact and conclusions of law as applied by the district court. *In re Morrison,* 555 F.3d 473, 480 (5th Cir. 2009). A bankruptcy court's findings of fact are reviewed for clear error and conclusions of law are reviewed *de novo. Id.* Its findings of fact may be reversed only if the reviewing court has "the definite and firm conviction that a mistake has been made." *Id.*

---

[3] This court accepted certification of direct appeal pursuant to 28 U.S.C. § 158(d) but we denied, perhaps in error, a stay of confirmation pending appeal. *See In re Pacific Lumber*, 584 F.3d at 242-43.

No. 09-40307

## III. DISCUSSION

We consider, in turn, the district court's jurisdiction over this appeal, whether the appeal must be dismissed for equitable mootness due to the substantial consummation of the reorganization plan, and the merits of the Noteholders' § 507(b) claim.

### A. Jurisdiction

The Noteholders argue that the § 507(b) order was separate from the confirmation order and that, accordingly, their appeal of the confirmation order did not deprive the district court of jurisdiction to hear its challenge to the § 507(b) order.

At issue is the jurisdictional significance of the notice of appeal of the confirmation order. "The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58, 103 S. Ct. 400, 402 (1982). In bankruptcy, discrete controversies within the overall case framework may often deserve separate appellate consideration: "Concepts of finality, for example, are less concrete in the bankruptcy context and, thus, principles disfavoring appeal of orders that do not dispose of an entire case are often less rigorously adhered to in bankruptcy cases." *In re Transtexas Gas Corp.*, 303 F.3d 571, 580 (5th Cir. 2002). As a result, this court has "repeatedly recognized that, when a notice of appeal has been filed in a bankruptcy case, the bankruptcy court retains jurisdiction to address elements of the bankruptcy proceeding that are not the subject of that appeal." *Id.* at 580 n.2. It may even continue to address matters indirectly implicated in the appeal. Accordingly, this court has specifically rejected "the broad rule that a bankruptcy court may not consider any request which either directly or indirectly touches upon the issues involved in a pending appeal and may not do anything which has any

8

impact on the order on appeal." *In re Sullivan Cent. Plaza I, Ltd.*, 935 F.2d 723, 727 (5th Cir. 1991). These precedents point toward a functional test: "once an appeal is pending, it is imperative that a lower court not exercise jurisdiction over those issues which, although not themselves expressly on appeal, nevertheless so impact the appeal so as to interfere with or effectively circumvent the appeal process." *In re Whispering Pines Estates, Inc.*, 369 B.R. 752, 759 (B.A.P. 1st Cir. 2007).

The specific question, then, is whether separate consideration of the § 507(b) issue would interfere with or allow the circumvention of the appeal of the confirmation order. We answer this question in the negative. The present appeal does not challenge the confirmation order or the MRC/Marathon plan, including the plan's valuation of the Noteholders' secured claim. Rather, it challenges the bankruptcy court's ruling on the diminution in value of the secured claim after the petition date and the status of sales proceeds of collateral before confirmation. These are independent factual inquiries, unrelated to confirmation. Further, because the payment of administrative priority claims must be made in cash, in full to confirm a reorganization plan (unless the parties agree otherwise), 11 U.S.C. § 1129(a)(9)(A), all parties were on notice of the legal priority of the Noteholders' § 507(b) claim and thus of its potential financial effect on confirmation. But the § 507(b) ruling was in no way dependent upon the plan confirmation. Indeed, the bankruptcy court held separate hearings on the § 507(b) motion, the parties briefed the issue apart from confirmation, and the bankruptcy court deliberately issued its ruling on the motion in a separate order. Both the parties and the bankruptcy court treated the two issues distinctly. We follow their lead.

This appeal raises issues that could not have been raised in the appeal of the confirmation order, seeks relief unavailable in that appeal, and could not have had the effect of interfering with that appeal or circumventing it. For those

No. 09-40307

reasons, the pendency of the confirmation order appeal did not deprive the district court of jurisdiction over this appeal.

## B. Equitable Mootness

The appellees argue that we should nonetheless dismiss this appeal as being equitably moot because reversal of the bankruptcy court's § 507(b) order at this time could destroy the reorganization and irreparably injure third parties who have relied on the reorganization plan since its confirmation.

The doctrine of equitable mootness is designed to protect concerns unique to bankruptcy proceedings. *Manges v. Seattle-First Nat'l Bank* (Matter of Manges), 29 F.3d 1034, 1038 (5th Cir. 1994). Equitable mootness is not an Article III inquiry into whether a live case or controversy exists, but rather a recognition that there is a point beyond which a court cannot order fundamental changes in reorganization actions. *Id.* at 1039. There are three factors to examine in an equitable mootness assessment: "(i) whether a stay has been obtained, (ii) whether the plan has been 'substantially consummated,' and (iii) whether the relief requested would affect either the rights of parties not before the court or the success of the plan." *Id.* The ultimate inquiry is whether it is prudent to upset a plan of reorganization when a period of time has passed after its implementation, *id.* (citation omitted), or, in other words, "whether the court can grant relief without undermining the plan." *In re SI Restructuring, Inc.*, 542 F.3d 131, 136 (5th Cir. 2008).

The first two prongs are not at issue. The Noteholders were denied a stay, and the plan has been substantially consummated, as defined in 11 U.S.C. § 1101(2), over the past two years. *See In re Pacific Lumber Co.*, 584 F.3d at 242 (describing consummation). That leaves the question of impact on the reorganization and third parties.

No. 09-40307

This issue was raised, in a similar fashion, in the appeal of the confirmation order. We addressed it at some length—in particular, its application where full recovery may be impossible due to consummation:

> Other courts have carefully weighed the consequences before applying equitable mootness to issues raised on appeal of plan confirmation orders. Notably, they hold that appellate review need not be declined when, because a plan has been substantially consummated, a creditor could not obtain full relief. If the appeal succeeds, the courts say, they may fashion whatever relief is practicable. After all, appellants "would readily accept some fractional recovery that does not impair feasibility or affect parties not before this Court, rather than suffer the mootness of [their] appeal as a whole."

*Id.* at 241 (internal citations omitted, insertion in original).

The court considered mootness on a claim-by-claim basis and held moot only two claims for which there was "no remedy . . . other than unwinding the plan." *Id.* at 251. The most analogous claim to those at issue in the present case was the Noteholders' challenge of the valuation of their secured claim, which (as here) could have imposed a very significant liability on the estate, to the great detriment of both the success of the reorganization and third parties. The court found the issue not moot, due to the court's ability to fashion alternative forms of relief that did not upset the expectations of third parties. *Id.* at 243–44.

The appellees here argue that the relief sought by the Noteholders would upset third-party expectations because the reorganized entity does not have liquid assets on hand to pay a judgment of even a few million dollars. This issue is controlled by *Pacific Lumber*. First, the valuation claim in that case threatened a similarly-sized judgment on a similarly cash-poor entity, which had then just emerged from bankruptcy. Second, that a judgment might have "adverse consequences to MRC/Marathon is not only a natural result of any ordinary appeal—one side goes away disappointed—but adverse appellate consequences were foreseeable to them as sophisticated investors who opted to

11

No. 09-40307

press the limits of bankruptcy confirmation and valuation rules." *Id.* at 244. MRC and Marathon should not be considered third parties for the purposes of mootness analysis in this appeal any more than in the prior appeal of the confirmation order. Third and finally, so long as there is the possibility of "fractional recovery," the Noteholders need not suffer the mootness of their claims.

Based on *Pacific Lumber*, the Noteholders' appeal is not subject to dismissal for equitable mootness.[4]

## C. § 507(b) Claim

The Noteholders contend that the bankruptcy court erred in fixing the value of their § 507(b) claim.

This court has explained that adequate protection of a secured creditor's collateral and its fallback administrative priority claim are tradeoffs for the automatic stay that prevents foreclosure on debtors' assets: the debtor receives "breathing room" to reorganize, while the present value of a creditor's interests is protected throughout the reorganization. *In re Stembridge*, 394 F.3d 383, 387 (5th Cir. 2004). A secured creditor whose collateral is subject to the automatic stay may first seek adequate protection for diminution of the value of the property, 11 U.S.C. §§ 362(d)(1), 363(e), 364(d), and then, if the protection ultimately proves inadequate, a priority administrative claim under § 507(b). Section 507(b) of the Bankruptcy Code allows an administrative expense claim under § 503(b) where adequate protection payments prove insufficient to compensate a secured creditor for the diminution in the value of its collateral. "It is an attempt to codify a statutory fail-safe system in recognition of the ultimate reality that protection previously determined the 'indubitable

---

[4] In the interests of judicial economy and finality, we also decline the appellees' suggestion that the legal questions presented in this appeal be remanded for consideration by the district court.

12

equivalent' . . . may later prove inadequate." *In re Carpet Ctr. Leasing Co., Inc.*, 4 F.3d 940, 941 (11th Cir. 1993) (internal quotation marks and citations omitted).

On six occasions, the bankruptcy court entered orders authorizing Scopac to use the Noteholders' and Bank of America's cash collateral to operate its business and preserve the estate, and in each order it required Scopac to provide adequate protection under § 363(e).[5]  At issue is the extent of that protection.

## 1.    Timber Sales Proceeds

The Noteholders first argue that the bankruptcy court erred when it declined to recognize their lien on $29.7 million in proceeds that Scopac took in from timber sales during the pendency of the bankruptcy.  At the petition date, the Noteholders held a secured claim on Scopac's non-timber collateral of $48.7 million, subject to Bank of America's higher priority lien of $36.2 million.  The bankruptcy court, in calculating the value of the Noteholders' § 507(b) claim, deducted the $36.2 million from the cash collateral available at the filing date only, leaving $12.5 million, from which it further deducted the $8.9 million that Scopac had paid the Noteholders' professionals for services during the bankruptcy litigation.  This left a $3.6 million interest.  The Noteholders assert, and we agree, that this conclusion was flawed.

---

[5] The cash collateral order of March 18, 2008, for example, directed that:

Each of BofA and the Trustee . . . is also granted a superpriority cost of administration priority claim under 11 U.S.C. § 507(b) to the extent of the postpetition diminution of their respective interests in the Prepetition Collateral and the Cash Collateral.
. . . .
No costs or expenses of administration or other costs or expenses of Scopac that have been or may be incurred in its Chapter 11 case shall be charged either against BofA's or the Trustee's Prepetition Collateral or Cash Collateral pursuant to Section 506(c) of the Bankruptcy Code without the prior express written consent of each of BofA and the Trustee.

Scopac's Third Final Order (Agreed) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code at 10, *In re Scotia Dev. LLC, et al.*, No. 07-20027-C-11 (Bankr. S.D. Tex. Mar. 18, 2008).

No. 09-40307

Each of the court's cash collateral orders granted Bank of America and the Noteholders (in varying language):

> [A] first priority, perfected replacement lien and security interest in all the property of Scopac of the same type as the Prepetition Collateral in which BofA and the Trustee do not have a lien because of the operation of Section 552 of the Bankruptcy Code and in the Cash Collateral of Scopac, to the extent of the postpetition diminution of its interests in the Prepetition Collateral and the Cash Collateral.

Further, the orders were perfectly clear that the "proceeds and product of the Prepetition Collateral constitute cash collateral." *See* 11 U.S.C. § 363(a) (defining "cash collateral").

The cash collateral orders protected the Noteholders in two ways. They protected against a diminution in the value of the $48.7 million cash collateral that existed at the date of filing. They also specifically granted a continuing lien in the proceeds of the prepetition collateral, *i.e.*, the $29.7 million generated proceeds from timber sales during the reorganization. The bankruptcy court entirely omitted the second component from its calculations and failed to credit those proceeds to the Noteholders' § 507(b) claim.

Appellees object to the Noteholders' $29.7 million claim because, they say, this contention was waived in the trial court, the Appellees were prejudiced thereby, and the Noteholders "have no valid superpriority claim to Scopac's net proceeds." Br. for Appellees at 42. Their attempt to dispute, at this late stage, the precise terms of the cash collateral orders quoted above is unavailing. The questions of waiver and prejudice are closer, but ultimately also unpersuasive.

We have carefully reviewed the Noteholders' pleadings and briefing in connection with their § 507(b) claim. The claim rested clearly on the provisions of the cash collateral orders. Testimony at the hearing established that the cash collateral included $48.7 million at the date of filing and $29.7 million additional

14

revenue derived during the case from timber proceeds. At several points during this litigation, the Noteholders observed that this amount ($29.7 million) closely approximated what the court had authorized in payment to various bankruptcy professionals during the case. Although the Noteholders may have consented to payments to professionals, the Appellees concede that "in exchange they were granted adequate protection." Br. for Appellees at 46, n.17. The Noteholders had the burden to prove their entitlement to a § 507(b) priority claim. *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 866 (4th Cir. 1994). They did so by developing the evidence and resting on the terms of multiple cash collateral orders. Although they could have put this point more precisely,[6] their entitlement to a lien and priority claim on nearly $30 million in proceeds from the sale of their timber collateral did not evaporate, nor was it waived. With the correct and complete amounts of cash collateral put before it, the court should have included the $29.7 million proceeds for timber sales. The Appellees are not prejudiced by this result, which flows directly from multiple cash collateral orders subscribed by Scopac and the bankruptcy court. Nor should Appellees have any claim to renege on the cash collateral orders for equitable reasons.

## 2.    Payment to Noteholders' Professionals

The Noteholders next argue that the bankruptcy court improperly deducted from their § 507(b) claim $8.9 million in payments that Scopac made

---

[6]    Therefore, under Section 507(b), the Indenture Trustee is entitled to a superpriority administrative expense claim for the diminution of value in its collateral. This includes a superpriority administrative expense claim for the cash collateral that has been expended by Scopac, including but not limited to the over $20 million in professional fees and other expenses paid by Scopac.

Motion to Grant Indenture Trustee a Superpriority Administrative Expense Claim Pursuant to Section 507(b) at 4, *In re Scotia Dev. LLC, et al.*, No. 07-20027-C-11 (Bankr. S.D. Tex. May 1, 2008).

to the Noteholders' professionals out of cash collateral proceeds.[7]  Principally, they urge that the court erred in deducting the sum after it had failed to count the $29.7 million in their favor for the § 507(b) claim.

The proceeds that came into the estate during the bankruptcy, discussed above, were almost entirely consumed by professional fees and related expenses incurred by the estate, the creditors' committees, and the Noteholders.  These payments  were authorized by the cash collateral orders.  The basis for the payments to the Noteholders' professionals was the Noteholders' lien on those proceeds.  By denying the Noteholders' claim on the proceeds, the bankruptcy court effectively charged the Noteholders for all of these expenses, including those incurred by the estate and the committees.  It then deducted the Noteholders' own professionals' fees, for a second time, from the amount that remained.  This was clear error.

The result of this re-evaluation of the cash collateral portion of the § 507(b) motion is as follows:

---

[7]    They also argue that this sum should not have been deducted from their claim because they would not have incurred these expenses but for the automatic stay.  The Noteholders rely on neither statutory provisions nor the cash collateral orders to support this argument.  They contend only that this case is "unique."  Nothing unique inheres in this situation.

No. 09-40307

Cash Collateral at date of bankruptcy:                                    $48.7 million
Net timber sales proceeds:                                             + $29.7 million
(Bank of America higher lien):                                         − $36.2 million
Net interest in cash collateral:                                        = $42.2 million

(Payment under MRC/Marathon Plan                                        −$3.6 million
    for cash collateral)

(Payment to Noteholders' professionals
    from timber proceeds)                                              −$8.9 million

Net owed for § 507(b) adequate protection                              $29.7 million

The Noteholders were entitled to receive an additional $29.7 million in payment of their administrative priority claim.

### 3.    Declining Value of Collateral

Finally, the Noteholders assert a claim for an alleged post-petition decline in the value of their secured interest in Scopac's timberland between the date of filing and the date of the hearing. They claim that the bankruptcy court erred in its determination that the property did not, in fact, decline in value.

The bankruptcy court's first error, they assert, was to compare the timberland's foreclosure value at the petition date to its fair-market value at the date of confirmation, which had the effect of obscuring the decline in the value of the property. An asset's foreclosure value is typically lower than its fair-market value. *Assocs. Commer. Corp. v. Rash*, 520 U.S. 953, 958 (1997) (explaining that fair-market value is "generally higher than what a secured creditor could realize pursuing . . . foreclosure . . . ."). In general, when valuing a secured claim under 11 U.S.C. § 506(a)(1), fair-market value is the appropriate measure. *Id.* at 965.

The bankruptcy court's ruling from the bench belies the argument that it looked exclusively to foreclosure value:

17

No. 09-40307

> [E]ven looking at the fair market value, the evidence showed that from filing to confirmation, the forests grew so that there are more trees. Capital improvements were made—roads, tree planting, watershed analysis—which freed more areas for harvesting. Perhaps the roads don't add any value, as Mr. Dean suggested, but the tree planting and the watershed analysis did free up more areas for harvesting, which ultimately will lead to more value. All of this may lead to a value being higher at confirmation, but the Court is not prepared to make that finding that there has been any change in value since the filing.

The court proceeded to discuss additional evidence pertaining to the relative change in value of the timber itself, citing a decrease in the discount rate since filing, which had the effect of increasing the market value of the forest. On net, the court found that, "the value of the forests has remained relatively constant since the filing." This is the proper comparison, and no legal error occurred.

The crux of this challenge is to the bankruptcy court's factual findings, which are subject to review for clear error. The court reached its determination following three days of hearings on the § 507(b) issue, extensive briefing by both parties, and testimony by several experts. The Appellees' chief expert, LaMont, is a timberland appraiser who testified that the value of the timberland had increased due to forest growth, stable log prices, and the decline in the discount rate. The Noteholders and their experts challenged several aspects of LaMont's methodology, but the court ultimately found him to be credible and his testimony creditable. MRC's chairman also testified, stating that MRC's internal valuation model also showed an increase in the value of the timberland due to the discount rate.

The evidence on which the court premised its determination is strikingly similar—the same experts, the same types of evidence, the same methodologies, etc.—to that underlying the confirmation order appeal. This court ultimately concluded that the bankruptcy court was justified in giving LaMont's testimony "significant weight" and that its valuation finding was not clearly wrong. *In re*

18

*Pacific Lumber*, 584 F.3d at 248. It is difficult to see, given the similarity of the issues and record, how a different result could be reached in the present appeal.

The Noteholders also fault the bankruptcy court for relying on "hindsight analysis" to determine the value of timberland on the petition date. This, too, is a factual challenge. As the Noteholders acknowledge repeatedly, the court's task was to determine whether the timberland had declined in value and, if so, by how much. A methodology that works backwards from a later valuation would suffice. This argument, again, is with the bankruptcy court's evaluation and application of the expert testimony. And the expert testimony that the Noteholders criticize, LaMont's, was one among several factors in the bankruptcy court's final determination. The court relied primarily on a decline in the discount rate, a fact that the Noteholders do not challenge.

We are therefore without "the definite and firm conviction that a mistake has been made."

## IV. CONCLUSION

Being satisfied with our appellate jurisdiction, we have concluded that the bankruptcy court undervalued the Noteholders' priority administrative § 507(b) claim by $29.7 million. The court erred in not crediting their interest with timber sales proceeds that were received during the bankruptcy, on which they had a lien and priority interest arising from the court's many cash collateral orders. To deprive the Noteholders of this amount would undermine a fundamental protection for secured parties whose collateral is used by the debtor during its reorganization efforts.

The judgment of the district court is VACATED, and the case is REMANDED with instructions to enter judgment for the Noteholders for a $29.7 million administrative priority claim against the reorganized debtor.

**VACATED and REMANDED with Instructions.**