# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 18, 2026

Lyle W. Cayce
Clerk

No. 25-20119

IN THE MATTER OF INSTANT BRANDS ACQUISITION HOLDINGS INC. ET AL.,

*Debtor*,

GUANGDONG MIDEA CONSUMER ELECTRIC MANUFACTURING COMPANY LIMITED; FOSHAN SHUNDE MIDEA ELECTRICAL HEATING APPLIANCES MANUFACTURING COMPANY LIMITED; MIDEA ELECTRIC TRADING (SINGAPORE) CO. PTE LTD.,

*Appellants*,

*versus*

CORELLE BRANDS (TEXAS) INC.; CORELLE BRANDS ACQUISITION HOLDINGS LLC; CORELLE BRANDS ACQUISITION INTERMEDIATE HOLDINGS INC.; CORELLE BRANDS HOLDINGS INC.; CORELLE BRANDS (CHARLEROI) LLC; CORELLE BRANDS LLC; CORELLE BRANDS (CORNING) LLC; CORELLE BRANDS (LATIN AMERICA) LLC; EKCO GROUP, LLC; EKCO HOUSEWARES, INC.; EKCO MANUFACTURING OF OHIO, INC.; CORELLE BRANDS (CANADA) ULC; CORELLE BRANDS (CANADA) HOLDING ULC; CORELLE BRANDS ULC; CORELLE BRANDS (GHC) LLC;
OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

*Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:24-CV-847

―――――――――――――――――――――――

Before Haynes, Duncan, and Ramirez, *Circuit Judges*.
Stuart Kyle Duncan, *Circuit Judge*:

Appellants are companies (collectively, "Midea") that manufacture the Instapot cooking appliance. Midea objected to the reorganization plan of Appellees (collectively, "Corelle") who, pre-bankruptcy, purchased Instapots from Midea. Midea's specific objection was to Corelle's plan to retain post-bankruptcy indemnification rights for products purchased under completed purchase orders. The district court affirmed the bankruptcy court's denial of Midea's objection, and we AFFIRM.

I

Corelle began selling Instapot multifunction cookers under a 2016 master supply agreement (MSA) with the manufacturer Midea. Under the MSA, Corelle would order Instapots from Midea via individual purchase orders (POs). For each transaction, the POs would specify "at the minimum, date of order, model number/name, quantity, price (as mutually agreed upon by the parties from time to time), shipment date, and other shipment information that are sufficient for Midea to arrange shipment." Once Corelle placed a PO, Midea would invoice Corelle, which had a specified time (generally five days) to return the signed invoice to form a binding agreement.

The MSA contained two indemnification provisions. Under the first, Midea would compensate Corelle for losses caused by certain product recalls. Under the second, Midea had to obtain a product-liability insurance policy to indemnify Corelle against certain claims.

2

No. 25-20119

The parties completed numerous transactions under this arrangement until 2023. Corelle would regularly attach its own terms and conditions to the POs it sent Midea. These additional terms specified that they would "govern the purchase from [Midea]" of the products listed in the relevant PO. Corelle's terms also contained indemnity provisions requiring Midea to defend and indemnify Corelle against "any claim made by any entity or person" arising out of or relating to the PO.

In 2023, Corelle entered Chapter 11 bankruptcy proceedings and sought approval to sell most of its assets. Pursuant to the reorganization plan, Corelle split off and sold its appliances business. In doing so, Corelle assigned the Midea MSA to the purchaser. Midea objected, arguing the reorganization plan improperly allowed Corelle to retain indemnification rights for products purchased under previously executed POs. In Midea's view, the indemnification rights for completed POs should have been assigned along with the MSA.

The bankruptcy court denied Midea's objections, finding the POs, along with their indemnification rights, were contracts severable from the MSA. As a result, the indemnification rights for the individual POs remained with Corelle, which had made those orders and continued to be exposed to potential liability for those products.

Midea appealed this ruling to the district court, arguing that the MSA is a single indivisible agreement that incorporates all the POs made thereunder. Disagreeing, the district court affirmed the bankruptcy court's ruling, finding that both the structure of the MSA and the course of performance evidence showed the parties intended to, and did in practice, separately assent to each individual PO.

Midea now appeals that ruling to our court.

No. 25-20119

## II

We review the bankruptcy court's findings and conclusions under the same standard as the district court. *In re Scopac*, 624 F.3d 274, 279–80 (5th Cir. 2010). Findings of fact are reviewed for clear error and conclusions of law are reviewed *de novo. Ibid.*

"Our review is properly focused on the actions of the bankruptcy court." *In re Age Ref., Inc.*, 801 F.3d 530, 538 (5th Cir. 2015) (citing *In re Perry*, 345 F.3d 303, 309 (5th Cir. 2003)). "Although we may 'benefit from the district court's analysis of the issues presented, the amount of persuasive weight, if any, to be accorded the district court's conclusions is entirely subject to our discretion.'" *Ibid.* (quoting *In re CPDC, Inc.*, 337 F.3d 436, 441 (5th Cir. 2003)).

## III

Midea raises three main issues on appeal. First, Midea argues the district court erred by subjecting the bankruptcy court's divisibility ruling to clear-error review rather than *de novo* review. On this point, Midea adds that the bankruptcy court failed to make sufficient findings as to divisibility. Second, Midea argues the bankruptcy court erred in finding that the MSA and POs were divisible contracts. And third, Midea argues that a debtor's retention of pre-assignment indemnity claims under an assumed and assigned contract violates 11 U.S.C. § 365(f).

## A

We first consider the standard of review and the sufficiency of the bankruptcy court's factual findings. Midea argues the district court erred by reviewing the bankruptcy court's divisibility finding under a clear-error standard. According to Midea, that finding is a mixed question of law and fact that should be reviewed *de novo*. Moreover, Midea adds that the bankruptcy

4

court's failure to explicitly make fact findings left the district court with no actual findings to review. We address each of Midea's arguments in turn.

Contrary to Midea's argument, we conclude the district court properly reviewed the bankruptcy court's findings under the clear-error standard. For mixed questions of law and fact, the standard of review "depends on whether answering it entails primarily legal or factual work." *Monasky v. Taglieri*, 589 U.S. 68, 83–84 (2020) (citation modified). Here, clear-error review was appropriate because the bankruptcy court used course-of-performance evidence to resolve ambiguities in the contract. *Tex. E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir. 1998) (quoting *Tarrant Distribs., Inc. v. Heublein, Inc.*, 127 F.3d 375, 377 (5th Cir. 1997)); *see also In re Bouchard Transp. Co., Inc.*, 74 F.4th 743, 749 (5th Cir. 2023) (clear-error review for mixed questions in a bankruptcy case involving largely factual determinations); *Comar Marine, Corp. v. Raider Marine Logistics, L.L.C.*, 792 F.3d 564, 578 (5th Cir. 2015) (clear-error review where contract interpretation turned on extrinsic evidence).

Midea also contests the adequacy of the bankruptcy court's findings, arguing it did not find enough facts to give the district court (and our court) anything to review. We disagree. Such findings must only be sufficiently "detailed to give us a clear understanding of the analytical process by which [the] ultimate findings were reached and to assure us that the trial court took care in ascertaining the facts." *Eni US Operating Co. v. Transocean Offshore Deepwater Drilling, Inc.*, 919 F.3d 931, 935 (5th Cir. 2019) (alteration in original) (quoting *Golf City, Inc. v. Wilson Sporting Goods, Co.*, 555 F.2d 426, 433 (5th Cir. 1977)). Here, the bankruptcy court made an express finding on divisibility, which is the very question at issue. That finding is enough to provide a "clear understanding" of its reasoning and to "assure us" that the court "took care in ascertaining the facts." *Ibid.* (quoting *Golf City*, 555 F.2d at 433).

B

We turn next to contract divisibility. Midea argues that, contrary to the bankruptcy court's ruling, both the plain language of the MSA and the parties' course of performance show the MSA and POs were intended to be nondivisible contracts. We disagree.

A severable or divisible contract "includes two or more promises which can be acted on separately such that the failure to perform one promise does not necessarily put the promisor in breach of the entire agreement." *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 739 (5th Cir. 1996) (quoting *Severable Contract*, BLACK'S LAW DICTIONARY (6th ed. 1990)). "Under Texas law, a contract is divisible, or severable, when one party's performance consists of more than one distinct and separate item and the price paid by the other party is apportioned to each item." *Ibid.* (internal quotation omitted). Divisibility "depends primarily on the intention of the parties, the subject matter of the agreement, and the conduct of the parties." *Ibid.* (quoting *Johnson v. Walker*, 824 S.W.2d 184, 187 (Tex. App. 1991)). A key consideration is the intent of the parties, particularly the unambiguous language of the contract in question. *Ibid.*

1

Contract language is unambiguous if it "can be given a definite or certain legal meaning." *Addicks Servs., Inc. v. GGP–Bridgeland, LP*, 596 F.3d 286, 294 (5th Cir. 2010) (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)). When interpreting unambiguous contracts, courts must remain within the contract's four corners and should not import extrinsic evidence to create any ambiguity. *Ibid.*

In this case, the language of the MSA does not unambiguously show that the parties intended the contracts to be indivisible. Midea cites two

No. 25-20119

clauses (Sections 17.2 and 17.7), which it argues unambiguously show indivisibility. But neither section supports such a finding.

Section 17.7 is nothing more than a standard parol-evidence clause.[1] Such clauses serve to "prevent either party from introducing parol evidence to prove that an agreement other than the [current written] agreement . . . exist[s]." *ECHO, Inc. v. Whitson Co.*, 52 F.3d 702, 707 (7th Cir. 1995). The clause does not speak to the issue of divisibility.

Section 17.2 provides that "either party may assign this agreement in its entirety (including all [POs] and PIs)." Midea argues this provision reveals the assumption that the POs are inseparable from the MSA. We again disagree. While the provision does show that the POs are related to the MSA, no one contends otherwise. What the provision does not show, however, is whether the POs are or are not divisible from the MSA. The provision does not unambiguously prove that one way or the other.

2

Because neither section unambiguously shows the MSA and the POs were indivisible, we must examine "the intention of the parties, the subject matter of the agreement, and the conduct of the parties." *Stewart*, 83 F.3d at 739 (citing *Johnson*, 824 S.W.2d at 187). "The intent of the parties is the principal determinant of divisibility." *Ibid.* (citations omitted).

First, as to the parties' intent, the record shows that Midea and Corelle contemplated that the MSA would provide a foundation for an

---

[1] Section 17.7 provides, "This Agreement, the purchase orders, PIs and any attachments hereto, all of which are hereby incorporated by references [sic] into this Agreement and made part hereof, sets forth the entire agreement and supersedes any and all previous oral or written agreements, assurances, representations, communications and understandings of the parties with respect to the subject matter hereof."

ongoing business arrangement characterized by an open-ended number of separate transactions. These separate transactions required negotiation of terms, including price, quantity, and various other specifications.

Although the MSA defined certain parameters for future purchases,[2] it did not obligate Corelle to purchase any certain number of appliances from Midea nor did it specify a set price. These order details were offered and accepted by the parties on a case-by-case basis. Such variable terms contemplated by the MSA for each PO included price, packaging, specifications, and delivery.

Midea argues this case is analogous to *Shell W. E & P, Inc. v. Pel-State Bulk Plant, LLC*, where the court held an oilfield MSA to be indivisible from work orders governing performance on different wells. 509 S.W.3d 581, 587 (Tex. App. 2016). But the MSA in *Shell* explicitly specified that it included future work orders, obligated the contractor to provide services, and strictly limited the details that could be determined in individual work orders. *Id.* at 587–88. Here, by contrast, the MSA does not contain explicit language unifying the POs and the MSA, does not obligate future purchases, and does not prescribe exacting specifications for future POs.

Moreover, unlike in *Shell*, the MSA did not set a definite time period during which the MSA would govern. 509 S.W.3d at 588. To the contrary, it contemplated an open-ended arrangement whereby particular requirements and specifications could be negotiated for each separate transaction. And, also in contrast to *Shell*, the MSA here was not revisited and renegotiated each time requirements or specifications changed. *Ibid.* Rather, necessary

---

[2] *See, e.g.*, MSA Sections 1.1, 1.2 (providing Corelle may place POs and Midea may accept those POs); MSA Sections 5.4, 6.1, 6.2 (indemnification terms).

updates to pricing, quantities, and other terms were negotiated and assented to every time Corelle issued a PO.

For many of the same reasons, the subject matter of the MSA and POs point to the same conclusion. True, both contracts generally addressed the sale and purchase of Instapots, but the object of each was distinct. The MSA governed the ongoing relationship with Corelle for purchasing Instapots while the POs addressed the varying requirements and specifications of each individual purchase transaction. *See Stewart*, 83 F.3d at 740 (the "subject matter" of two portions of an agreement can be differentiated when they "are distinct and clearly defined"). Subject matter therefore suggests divisibility.

Finally, the course-of-performance evidence also points towards divisibility. *See Stewart*, 83 F.3d at 739. The most relevant evidence is that (1) the parties assented separately to each PO; (2) Corelle regularly added its own terms and conditions to the POs; and (3) price and quantity, manufacturing and packaging specifications, and delivery terms (prescribed by the MSA as variable) were regularly altered across the various POs.

In other words, although the MSA provided a framework for the ongoing commercial relationship between Midea and Corelle, evidence of the parties' performance supports the conclusion that each PO constituted a unique transaction.

Resisting this conclusion, Midea points to various aspects of the parties' conduct that, it argues, show the contracts were indivisible. For instance, it observes that both parties apparently disregarded the additional terms Corelle attached to each PO and also that the POs incorporated indemnification terms from the MSA. Midea also points out that Corelle listed a cure amount for assigning the MSA that included amounts due for

unpaid POs, and also that Corelle failed to list the POs on their notice of assumption and assignment.

At most, this evidence supports Midea's interpretation of the course of performance. But we have explained there was opposing evidence showing that each PO constituted a separate transaction. As a result, we cannot say the bankruptcy court clearly erred in its divisibility finding.

\*　　\*　　\*

In sum, the intent of the parties, the subject matter of the agreement, and the parties' course of performance all support the finding that the POs were divisible from the MSA. Accordingly, the bankruptcy court did not err in denying Midea's objection to Corelle's reorganization plan based on contract divisibility.

C

Finally, we turn to 11 U.S.C. § 365(f). That provision allows "executory contracts" to be assigned, but only if performance is guaranteed and the contract is not modified by the transfer. *See* 11 U.S.C. § 365(f)(2). An "executory contract" is one that "neither party has finished performing." *See In re Thornhill Bros. Fitness, L.L.C.*, 85 F.4th 321, 324–25 (5th Cir. 2023) (quoting *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 372 (2019)). If a party wants to assign an executory contract, it is all or nothing—it must be assigned or assumed in its entirety. *Id.* at 325.

Midea argues the bankruptcy court violated § 365(f). By permitting Corelle to retain indemnification rights under completed POs, Midea argues the bankruptcy court allowed the partial assignment of the MSA, an executory contract, outside the parameters of § 365(f). We disagree.

As discussed, the bankruptcy court did not err in finding the MSA and POs were divisible. *See supra* III(B). That necessarily means the

No. 25-20119

bankruptcy court did not permit any partial assignment of the MSA. As that court explained, because the POs are "separable contracts," the assignment of the MSA "did not assume and assign completed [POs]." They are "nonexecutory, separable agreement[s]."

Accordingly, Corelle's retention of indemnification rights under the completed POs did not violate § 365(f).

IV

The district court's judgment, which affirmed the bankruptcy court's denial of Midea's objection to Corelle's bankruptcy plan, is AFFIRMED.